Approved: _____
KAIYA ARROYO / MICHAEL D. MAIMIN
Assistant United States Attorneys

Before:     THE HONORABLE JUDITH C. McCARTHY
            United States Magistrate Judge
            Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>JAMIE ORSINI, and<br>NICHOLAS ORSINI<br><br>　　　　　Defendants. | 23 Mag. 4655<br><br>**SEALED COMPLAINT**<br><br>Violation of 18 U.S.C. §§ 371,<br>2119(3) and 2<br><br>COUNTIES OF OFFENSE:<br>DUTCHESS and ORANGE |

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　　Joseph Merla, being duly sworn, deposes and says that he is an Investigator with the New York State Police, and charges as follows:

## COUNT ONE

　　　　1.　　On or about April 28, 2020, in the Southern District of New York, JAMIE ORSINI and NICHOLAS ORSINI, the defendants, with the intent to cause death and serious bodily harm, knowingly took a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, and did aid and abet the same, and death resulted, to wit, the defendants killed Steven Kraft and drove his car from Beacon, New York, to Newburgh, New York.

　　　　(Title 18, United States Code, Sections 2119(3) and 2).

## COUNT TWO

　　　　2.　　From at least on or about April 26, 2020, up to and including on or about April 28, 2020, in the Southern District of New York and elsewhere, JAMIE ORSINI and NICHOLAS ORSINI, the defendants, together with others known and unknown, knowingly and willfully did conspire and agree together and with each other to commit one and more offenses against the United States, to wit, 18 U.S.C. § 2119.

3.    It was a part and object of the conspiracy that JAMIE ORSINI and NICHOLAS ORSINI, the defendants, together with others known and unknown, with the intent to cause death and serious bodily harm, would and did knowingly take a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, in violation of 18 U.S.C. § 2119.

## Overt Acts

4.    In furtherance of the conspiracy and to effect the illegal objects thereof, JAMIE ORSINI and NICHOLAS ORSINI, the defendants, together with others known and unknown, committed the following overt acts in the Southern District of New York:

a.    On or about April 26, 2020, the ORSINIS traveled to a Home Depot in the Town of Fishkill, New York, to purchase supplies for a scheme to murder Steven Kraft and take his car.

b.    On or about April 26, 2020, at a Home Depot in the Town of Fishkill, New York, JAMIE ORSINI purchased supplies for a scheme to murder Steven Kraft and take his car, paying cash.

c.    On or about April 26, 2020, the ORSINIS drove from Beacon, New York, to Newburgh, New York, in order to determine how to dispose of Steven Kraft's car.

d.    On or about April 27, 2020, the ORSINIS traveled to a Walmart in the Town of Fishkill, New York, to purchase a "burner phone" to use as part of the scheme to murder Steven Kraft and take his car.

e.    On or about April 27, 2020, NICHOLAS ORSINI purchased a "burner phone" to use as part of the scheme to murder Steven Kraft and take his car.

f.    On or about April 28, 2020, NICHOLAS ORSINI drove Steven Kraft's car from Beacon, New York, to Newburgh, New York

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5.    I am an Investigator with the New York State Police, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with other law-enforcement agents and civilian witnesses and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts

that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6.      This complaint relates to the murder of Steven Kraft on or about April 28, 2020. In particular, JAMIE ORISINI and NICHOLAS ORSINI, the defendants,[1] planned to, and did, murder Steven Kraft—who was JAMIE's ex-husband and the father of two children with JAMIE—take and get rid of Kraft's car, and dispose of Kraft's body, covering their tracks. As set forth in detail below, there is probable cause to believe that:

a.      During the days leading up to April 28, 2020, the ORSINIS began preparing to murder Steven Kraft at their home in Beacon, New York, and to cover up that murder. Among other things, they planned to take Kraft's car as part of the murder, and dump that car in Newburgh, New York.

b.      On April 28, 2020, the ORSINIS carried out their plan, killing Kraft and taking his car, driving it to Newburgh, and otherwise beginning their cover-up of the murder.

c.      In the days after the murder, the ORSINIS continued the cover-up, traveling extensively between Beacon and upstate New York, ultimately disposing of Kraft's body—which still has not been found—by burning it.

**The Two Days Before the Murder of Steven Kraft**

7.      I have reviewed cell site and GPS data associated with the ORSINIS' personal phones,[2] surveillance video from both private stores and public cameras, and store receipts, and learned the following:

a.      On or about April 26, 2020, both of the ORSINIS' personal phones traveled together from the area of the ORSINIS' home at 10 West Church Street in Beacon, New York, to and from a Home Depot in the Town of Fishkill, New York. At approximately the time that the ORSINIS' personal phones were located in the area

---

[1] Because the defendants share a last name, when this complaint refers to them individually, it will refer to their first names—"JAMIE" and "NICHOLAS"—and, when it refers to them jointly, it will refer to the "ORSINIS.".

[2] I have reviewed the data in conjunction with law enforcement experts in such data, who assisted in plotting the location data. The ORSINIS later supplied their personal phones to law enforcement, thus establishing their phone numbers.

of the Home Depot, parking-lot surveillance video showed the ORSINIS' GMC Envoy[3] pull up to the Home Depot, and a woman consistent with JAMIE's appearance got out of the GMC and walked into the Home Depot. Shortly thereafter, interior surveillance video from the Home Depot showed a woman consistent with JAMIE's appearance purchasing a number of items at the cash register; a store receipt showed that she purchased, among other things, a 10x100 foot paint tarp, duct tape, and a Tyvek suit and boots, paying cash. Parking lot surveillance video then showed a man consistent with NICHOLAS's appearance get out of the GMC, help the woman consistent with JAMIE's appearance put the supplies into the GMC, the man and woman get back into the GMC, and the GMC driving away at approximately the time that the ORSINIS' personal phones left the parking lot.

      b.    Also on or about April 26, 2020, both of the ORSINIS' personal phones traveled together along a circuitous route—pictured below[4]—from the area of the ORSINIS' home at 10 West Church Street, in Beacon, New York, to the corner of Third Street and Carpenter Avenue in the City of Newburgh, New York. During that same time, surveillance video from public cameras and the Newburgh Beacon Bridge showed the ORSINIS' GMC moving consistently with NICHOLAS's personal phone.



      c.    On or about April 27, 2020, both of the ORSINIS' personal phones traveled together to a Walmart in the Town of Fishkill, New York. Surveillance video from the Sam's Club parking lot next to the Walmart showed the ORSINIS' GMC pulling into the parking lot. Surveillance video and a receipt from the Sam's Club showed NICHOLAS purchasing items at the Sam's Club at approximately 11:36 am.

---

[3] At all times relevant to this complaint, one car was registered to the ORSINIS: a GMC Envoy.

[4] The picture below uses the GPS data from NICHOLAS's personal phone, which is more precise and constant than the cell-cite data from JAMIE's personal phone.

At approximately 11:48 am, GPS data showed NICHOLAS's personal phone going into the area of the Walmart parking lot and store. A receipt from Walmart showed the cash purchase of a trac phone and sim card—often known as a "burner phone" because it can be activated without an account requiring personal information—associated with a phone number ending in 7755 at approximately 11:56 pm.[5] Minutes later, the ORSINIS' personal phones traveled together back to the ORSINIS' home at 10 West Church Street.

**The Carjacking and Murder of Steven Kraft on April 28, 2020**

8.     I have reviewed cell-site and GPS data associated with both of Kraft's phones[6] and the personal phones of JAMIE ORSINI and NICHOLAS ORSINI, the defendants, as well as the 7755 burner phone, family court documents, surveillance video, documents provided by a restaurant, and evidence obtained through a search of Steven Kraft's apartment, and spoken with an attorney for Kraft, and learned that, on April 28, 2020, Kraft picked up his children from the Orsinis' home at 10 West Church Street in Beacon, New York, at approximately 4:00 pm, drove to a Sonic restaurant in the Town of Newburgh—followed by the ORSINIS, the defendants—and then to his home, returning to 10 West Church Street at approximately 7:00 pm, and that the ORSINIS activated the 7755 burner phone along the way. In particular:

a.     According to Kraft's custody agreement with JAMIE and Kraft's attorney, Kraft had custody of his daughters from 4:00 pm to 7:00 pm on Tuesdays, as well as every other weekend, and historical cell-site data showed Kraft's phones moving consistent with his custody agreement. A surveillance photo from the deli in Marlboro where Kraft works shows that he was there during his shift on Tuesday, April 28, 2020, and left before 4:00 pm; GPS data shows that Kraft's phones moved from the deli to the area around 10 West Church Street, arriving around 4:00 pm,

---

[5] As discussed below, there is probable cause to believe that NICHOLAS possessed and used the 7755 phone on the night of the carjacking and murder.

[6] Kraft had two phones: a Samsung Galaxy J3 and a Samsung Galaxy S10. I believe the phones belonged to Kraft because, among other things, Kraft's co-workers provided the phone numbers to law enforcement as Kraft's phone numbers; the phone numbers for both the J3 and S10 phones are attached to Kraft's Google account, a phone belonging to JAMIE ORSINI, the defendant, communicated with the phone number associated with the J3 phone, and I have reviewed text messages between the two that are consistent with JAMIE communicating with Kraft; and the J3 phone was found in Kraft's car after it was abandoned in the City of Newburgh, New York.

and surveillance footage from the Newburgh Beacon bridge shows Kraft's Toyota Camry[7] crossing consistent with his GPS data.

b.      GPS data shows Kraft's phones moving from 10 West Church Street to a Sonic restaurant in the Town of Newburgh, New York, and then to Kraft's home in Marlboro. Surveillance video from the Sonic shows the driver of Kraft's Camry purchasing food (and that there was at least one person in the passenger seat and there was movement in the car); a receipt from Sonic shows the purchase of two bacon cheeseburger combination meals; and Sonic wrappers were found at Kraft's home in Marlboro. GPS data shows Kraft's phones returning to 10 West Church Street at approximately 7:00 pm; surveillance video from the Newburgh Beacon Bridge shows Kraft's Camry crossing consistent with that data.

c.      GPS data showed NICHOLAS's personal phone—and cell-site data showed JAMIE's personal phone—following Kraft's phones to Sonic; surveillance video from the Sonic showed the ORSINIS' GMC pulling up to purchase food shortly after Kraft's Camry; a Sonic receipt showed the purchase of $7.77 of food at approximately the time that the ORSINIS' GMC pulled up, and a credit card receipt—using JAMIE's credit card—showed a $7.77 purchase of a children's burger with bacon, small French fries, an apple juice box, and a quarter pounder with cheese by the ORSINIS at Sonic.

d.      GPS data for NICHOLAS's personal phone and cell-site data for JAMIE's personal phone showed the phones moving from the Sonic to the parking lot by the Home Depot and Dunkin Donuts up the road from the Sonic. At that time, surveillance video from the parking lot shows the ORSINIS' GMC pulling into the parking lot; cell-site data and phone records for the 7755 burner phone show the 7755 burner phone being activated in the area of the parking lot at the time that the OR-SINIS' GMC was in the parking lot. GPS data for NICHOLAS's personal phone and cell-site data for JAMIE's personal phone show that the two phones moved back to 10 West Church Street after the 7755 burner phone was activated.[8]

9.      I have reviewed GPS and cell-site data associated with both of Kraft's phones and the personal phones of JAMIE ORSINI and NICHOLAS ORSINI, the defendants, as well as text messages from various phones and an iPad, and law enforcement officers have spoken with one of NICHOLAS's co-workers as well as a representative of the American Automobile Association (the "AAA"), and I have learned

---

[7] According to Toyota's website, Toyota has engineering and/or manufacturing facilities in 12 states in the United States of America, none of which is New York State. See https://www.toyota.com/usa/operations/map.

[8] At this time, there is no cell-site data for the 7755 burner phone, which is consistent with it not being used and/or being turned off.

that, around the time that I believe Kraft's murder and carjacking took place, one of Kraft's phones—the J3 phone—was immediately outside of 10 West Church Street—almost certainly in Kraft's Camry—and the other of Kraft's phones—the S10 phone—as well as the ORSINIS' personal phones were in 10 West Church Street; NICHOLAS was initially unresponsive to a co-worker and then lied about why he was not at work; and JAMIE was unresponsive to one of her daughters. In particular:

        a.    I have reviewed pictures taken from a phone belonging to one of NICHOLAS's co-workers showing that, at approximately 6:08 pm on April 28, 2020, the co-worker texted NICHOLAS asking when he would come to work; at approximately 8:06 pm, the co-worker called NICHOLAS, who did not pick up; NICHOLAS did not respond until 8:10 pm, when he texted back that his wife's car broke down and they were waiting for a AAA tow ("Yo my wife is broken down near Harrimen triple a covering the toe o can't get there now. I'll be there tomorrow"); at 8:15 pm, NICHOLAS texted back a different story, explaining that he was putting his baby to bed ("I'm putting the baby to sleep. I'll answer if I can or call you back"). As described below, during this time, the ORSINIS' phones were both in or around 10 West Church Street, and AAA reports that they did not receive a call for a tow that evening.

        b.    I have reviewed text messages that one of daughters of JAMIE and Kraft sent to JAMIE: at approximately 7:53 pm, the daughter texted JAMIE "Where are u?" and, approximately two minutes later, the daughter texted JAMIE ".." JAMIE did not respond.

        c.    I have reviewed GPS, cell-site data, and call records associated with both of Kraft's phones and the ORSINIS' personal phones, and learned that, from approximately 7:00 pm through the evening, the ORSINIS' personal phones remained in or in the area of 10 West Church Street; from approximately 7:00 pm until approximately 8:44 pm, Kraft's S10 phone was in located in 10 West Church Street, and Kraft's J3 phone was located just outside of 10 West Church Street. (As described below, Kraft's J3 phone was eventually recovered in the console of Kraft's Camry; accordingly, I believe it likely that Kraft left the J3 phone in the Camry when he went into 10 West Church Street, which the ORSINIS did not realize).

    10.    I have reviewed GPS cell-site data, and call records associated with both of Kraft's phones and the personal phones of JAMIE ORSINI and NICHOLAS ORSINI, the defendants, as well as the 7755 burner phone, and surveillance footage, photographs' from one of JAMIE's online accounts, and evidence obtained from searches of 10 West Church Street as well as the ORSINIS' later home in Amsterdam, New York, and learned that NICHOLAS drove Kraft's Camry to the City of Newburgh, New York, where he abandoned it at Third Street and Carpenter Avenue, walked to a Sunoco gas station approximately a mile away—getting rid of Kraft's S10 phone along the way—used the 7755 burner phone to call a taxi (then immediately getting rid of the 7755 burner phone), and took the taxi back to 10 West Church Street. In particular:

a.      GPS data from each of Kraft's phones shows that, beginning at approximately 8:44 pm on April 28, 2020, they traveled from 10 West Church Street in Beacon to Third Street and Carpenter Avenue in the City of Newburgh, following approximately the same circuitous route as the ORSINIS had driven two days earlier (pictured below). Additionally, surveillance footage from I-84 and the streets of Newburgh show Kraft's Camry moving consistently with that route at the time that Kraft's phones were moving along that route.



b.      After Kraft's phones arrived at Third Street and Carpenter Avenue in the City of Newburgh, New York, according to GPS data, Kraft's J3 phone did not move. When the police seized Kraft's Camry—which was parked at Third Street and Carpenter Avenue—several days later, they found Kraft's J3 phone in the console of the car. However, GPS data showed Kraft's S10 phone moving west toward Robinson Avenue and then north along Robinson Avenue (which is also Route 9W) toward the Sunoco gas station. (The total walk from Third Street and Carpenter Avenue to the Sunoco gas station is approximately 1.1 miles). About 0.7 miles into that movement—in the area of a restaurant and a school—Kraft's S10 phone stopped providing GPS data, which is consistent with it being destroyed or turned off and discarded.[9] Surveillance video from that restaurant showed a single individual—who, for reasons set forth below, I believe to be NICHOLAS—walking north on Robinson Avenue, consistent with the GPS data; surveillance video from a Dunkin Donuts farther north on Robinson Avenue showed what appears to be the same individual walking north, consistent with the movement of the person on the earlier video.

---

[9] Kraft's S10 phone was never recovered.

c.      Surveillance video showed what appears to be the same man who I believe to be NICHOLAS at the Sunoco gas station—at a time consistent with having walked from where that individual was seen on the other surveillance video—make movements consistent with using a cellphone to make a call and then appear to dispose of the phone, enter the Sunoco gas station, purchase a Monster Energy Drink with a $100 bill, and walk back out; shortly thereafter, a taxi picks the individual up. Cell-site and call record data for the 7755 burner phone show that the 7755 burner phone was used at that time to call a taxi service from the area of the Sunoco gas station, and was never used again.[10] Surveillance footage from the Newburgh Beacon bridge shows the taxi traveling from Newburgh to Beacon at a time consistent with picking up the individual and driving him back to Beacon; video surveillance from a few blocks from 10 West Church Street show the taxi at 9:46 pm, which is consistent with the taxi picking up the individual at the Sunoco gas station and traveling over the Newburgh Beacon Bridge.

d.      I believe that individual was NICHOLAS because—in addition to his appearing to travel from Kraft's Camry, which he had just driven from 10 West Church Street, his use of the 7755 burner phone, and his travel back to the area of 10 West Church Street—in the surveillance video, the person was wearing a particular Jets sweatshirt/hoodie with the hood up, a patterned, blue bandana around his face, blue latex gloves, and a Levi's stadium baseball cap. I have reviewed a photograph of NICHOLAS from JAMIE's Google account in which he wore what appears to be the same Jets sweatshirt/hoodie. Additionally, in August 2020, law enforcement officials searched 10 West Church Street as well as the ORSINIS' new home in Amsterdam, New York, and found a patterned, blue bandana, latex gloves, and a Levi's stadium baseball cap identical to the ones worn at the Sunoco gas station. Still shots from the surveillance video, the photo from JAMIE's Google account (cropped to remove the face of a child), and photographs of some of the evidence found at the ORSINIS' new home are pictured below.

---

[10] The 7755 burner phone was never recovered.



e.    During this entire time—*i.e.*, after approximately 7:00 pm on April 28, 2020—GPS data for NICHOLAS's phone and cell-site data for JAMIE's phone show that both phones remained in or near 10 West Church Street; NICHO-LAS's phone did not move at all.

f.     An iPad belonging to one of JAMIE's daughters and JAMIE's personal phone both show that, at approximately 9:43 pm, JAMIE's daughter texted JAMIE "Goodnightloveyou."

g.     The ORSINIS' personal phones both show that, at approximately 9:47 pm, JAMIE texted NICHOLAS: "He's asleep … so come in the room so we can fuck."[11]

**The Aftermath of the Murder and Carjacking and Further Cover-Up**

11.     In the days after the murder and carjacking, JAMIE ORSINI and NICHOLAS ORSINI, the defendants, engaged in conduct consistent with, and indicative of, attempts to evade responsibility and detection, including repeated trips to the area of Amsterdam, New York, which trips were taken with a new burner phone, and not their personal phones, which would have been traceable via cell site, suspicious Google searches, text messages that appear to create a trail to indicate to investigators that the ORSINIS believed Kraft to be alive, and activities that indicate that the ORSINIS cut up Kraft's body and burned it.

12.     I have reviewed cell-site and GPS data from the personal phones belonging to NICHOLAS ORSINI and JAMIE ORSINI, the defendants, surveillance video, store receipts, license-plate-reader data, text messages, and call record details, and learned that there is probable cause to believe that, on or about April 29, 2020—the day after the murder and carjacking—NICHOLAS drove to Amsterdam, New York[12]—purchasing a new burner phone along the way, but leaving his personal phone behind—and back on the same day, and JAMIE sent a text message to Steven Kraft to create the impression that she did not know he was dead. In particular:

a.     According to GPS and cell-site data for the ORSINIS' personal phones, both phones remained at 10 West Church Street during the relevant hours of the day on April 29, 2020.

b.     According to surveillance video from both the Town of Beacon and I-84, beginning no later than at or about 8:03 am, the ORSINIS' GMC traveled from

---

[11] One of the ORSINIS' children was a very young boy. The ellipses are in the original text message.

[12] At the time, NICHOLAS had family living in Amsterdam, New York, including family who owned many acres of farmland. According to cell-site and GPS data, before this period of time, the ORSINIS would very rarely travel to Amsterdam. Within approximately two months, the ORSINIS moved to Amsterdam, and they continue to live in that area.

Beacon and westbound on I-84, in a direction consistent with going to a Walmart in the Town of Newburgh.

        c.     According to a receipt provided by Walmart in the Town of New-burgh, New York, at or about 8:57 am, a trac phone and sim card—often known as a "burner phone" because it can be activated without an account requiring personal information—associated with a phone number ending in 2891 were purchased. I be-lieve that one of the ORSINIS purchased the 2891 burner phone because, among other things: (i) cell-site data for the 2891 burner phone over the next several days shows movement consistent with the movement of the ORSINIS' GMC; (ii) after the ORSINIS' GMC returned home that evening, cell-site data for the 2891 burner phone and GPS data for NICHOLAS's personal phone showed concomitant movement to and from NICHOLAS's place of work; (iii) call detail records show that, on or about May 1, 2020, the 2891 burner phone was used to call NICHOLAS's mother three times; (iv) I have reviewed texts between the 2891 burner phone and NICHOLAS's personal phone that regard setting up an online game on the 2891 burner phone called "Raid: Shadow Legends," which was already loaded on NICHOLAS's personal phone; and (v) on or about May 1, 2020, the 2891 burner phone was used to call a former associate of JAMIE's who lived in Queens.

        d.     According to a license plate reader in Saugerties, New York—about 45 miles north of the Walmart in the Town of Newburgh—at approximately 10:00 am, the ORSINIS' GMC was seen traveling northbound on I-87. According to surveillance footage from a Sunoco in Amsterdam, New York—approximately 76 miles north of Saugerties—at approximately 11:26 am, the ORSINIS' GMC was seen traveling on State Route 30. According to video surveillance and a receipt from a Wendy's in Amsterdam, approximately two minutes later, the ORSINIS' GMC went to the Wendy's, and a person who appears consistent with NICHOLAS's appearance ordered four value meals.

        e.     According to a license plate reader in Saugerties, New York, at approximately 3:47 pm, the ORSINIS' GMC was seen traveling southbound on I-87. According to video surveillance, the ORSINIS' GMC traveled on I-84 toward Beacon, New York at approximately 4:57 pm; two minutes later, the ORSINIS' GMC turned toward West Church Street in Beacon.

        f.     According to video surveillance, at approximately 5:49 pm, NICH-OLAS was at his place of work in Brewster, New York.

        g.     I have reviewed text messages from JAMIE's personal phone and learned that, at or about 7:33 pm on April 29, 2020, JAMIE sent a text message to one of Steven Kraft's phones asking about their children's report cards. I have re-viewed additional text messages between JAMIE and Kraft and learned that they did not typically text about their children's academics.

13.     I have reviewed Google searches on the personal phone of NICHOLAS ORSINI, the defendant, and learned that, on or about April 30, 2020, at approximately 3:54 pm, NICHOLAS searched for "How to view your location history in google maps." According to GPS data, at that time, NICHOLAS's phone was at 10 West Church Street.

14.     I have reviewed electronic mails provided by the work supervisor of NICHOLAS ORSINI, the defendant, and learned that, on or about May 1, 2020, NICHOLAS sent an electronic mail to his supervisor explaining that he had missed work because his wife had an interview and his car broke down.

15.     I have reviewed cell-site and GPS data from the personal phones belonging to NICHOLAS ORSINI and JAMIE ORSINI, the defendants, surveillance video, store receipts, license-plate-reader data, text messages, call-detail records, and paperwork and data maintained by a storage facility and learned that there is probable cause to believe that, on or about May 1, 2020, the ORSINIS drove to and from Amsterdam, New York—leaving their personal phones behind—and rented a locker in a storage unit in Middletown, New York, and JAMIE sent text messages to Steven Kraft to create the impression that she did not know he was dead. In particular:

a.      According to GPS and cell-site data for the ORSINIS' personal pones, both phones remained at 10 West Church Street during the relevant hours of the day on May 1, 2020.

b.      According to video surveillance, at approximately 6:11 am, on or about May 1, 2020, NICHOLAS left his place of work in Brewster, New York.

c.      According to a license plate reader in Saugerties, New York, at approximately 9:21 am on or about May 1, 2020, the ORSINIS' GMC was seen traveling northbound on I-87. According to surveillance footage from a Sunoco in Amsterdam, New York, at approximately 11:30 am, the ORSINIS' GMC was seen traveling north on State Route 30. According to video surveillance and a receipt from a Wendy's in Amsterdam, approximately two minutes later, the ORSINIS' GMC went to the Wendy's, and a person who appears consistent with NICHOLAS's appearance ordered four value meals. According to surveillance footage from the Sunoco in Amsterdam, at approximately 11:38 am, the ORSINIS' GMC was seen traveling south on State Route 30. According to cell-site data for the 2891 burner phone, between approximately 11:22 am and 12:51 pm, the 2891 burner phone was in the area of Amsterdam when used to make five phone calls.

d.      According to call detail records for the 2891 burner phone, on or about May 1, 2020, the burner phone was used to call a storage facility in Middletown, New York. According to paperwork provided by that storage facility, on or about May 1, 2020, JAMIE rented a locker in that facility. I have learned from a representative of the storage facility that the storage facility provides each renter a unique entry

code to enter the facility, and the facility keeps a record of the use of that code. According to the facility's entry-code data, the entry code assigned to JAMIE's locker was used to enter and exit the facility around 4:00 pm on May 1, 2020.

  e. According to video surveillance, at approximately 5:27 pm on or about May 1, 2020, NICHOLAS was at his place of work in Brewster, New York.

  f. I have reviewed text messages from JAMIE's personal phone and learned that, at or about 5:20 pm and 9:57 pm, JAMIE sent text messages to one of Steven Kraft's phones. According to cell-site data, JAMIE's personal phone was in the area of 10 West Church Street when the text messages were sent.

  16. According to call detail records and other records provided by a cell phone provider, I have learned that, on or about May 1, 2020, NICHOLAS ORSINI and JAMIE ORSINI, the defendants, changed the phone number of the 2891 burner phone in an apparent attempt to hide their tracks. In particular, according to call detail records, at approximately 6:16 pm on May 1 ,2020, the 2891 burner phone was used to call a former associate of JAMIE's in Queens, and, at 6:22 pm, the 2891 burner phone called the customer service line for the 2891 burner phone's service provider. According to records provided by that service provider, within minutes, the 2891 burner phone was switched to a phone number ending in 4921, though it maintained the same IMEI number, which allowed law enforcement to confirm it was the same phone.

  17. I have reviewed GPS data for the personal phone of NICHOLAS ORSINI, the defendant, Google search data for NICHOLAS's phone, surveillance video, and store receipts, and learned that there is probable cause that NICHOLAS looked into what others might know about his crime, researched what would be necessary to burn evidence (or a body), and purchased tools to dismember and burn a body. In particular:

  a. According to Google search data for NICHOLAS's phone, at approximately 2:09 pm and 2:10 pm on or about May 2, 2020, NICHOLAS searched for "Orange County News" and "Montgomery County News." I know that the City of Newburgh, New York, is located in Orange County, and Amsterdam—to which NICHOLAS had been taking day trips and where his mother was located—is located in Montgomery County.

  b. I have reviewed NICHOLAS's personal phone and learned that, at approximately 2:09 pm on or about May 2, 2020, NICHOLAS sent a text message to his mother: "Who did u tell I was coming up."

  c. I have reviewed video surveillance from Home Depot in the Town of Fishkill, New York, which shows that the ORSINIS' GMC pulled into the parking lot at approximately 3:31 pm on or about May 2, 2020, a white man—consistent with NICHOLAS—got out of the GMC and walked into the Home Depot, and then walked

out of the Home Depot approximately two minutes later without appearing to carry anything. According to GPS data for NICHOLAS's phone, at approximately 3:31 pm, the phone traveled to the Home Depot, then went to the Walmart, and then went to 10 West Church Street. According to Google search data for NICHOLAS's phone, at approximately 3:54 pm, NICHOLAS searched for "is galvanized steel fireproof?" According to video surveillance, at approximately 6:27 pm, the ORSINIS' GMC returned to the Home Depot parking lot and, at approximately 7:02 pm, a man consistent with Nick's build walked toward the register in the Home Depot with what appeared to be more than one galvanized steel trash cans, an axe, and other items, and, shortly after, that man put those items into the ORSINIS' GMC and drove away. According to a receipt provided by Home Depot, at approximately 7:02 pm, there was a purchase of two 31-gallon galvanized steel round trash cans, a coarse stainless-steel rod, an angle grinder with grinding wheel,[13] five metal disks, three 32-ounce bottles of odorless charcoal lighter fluid, two charcoal grates, an axe, and a flame lighter. According to GPS data for NICHOLAS's personal phone, the phone travelled to the Home Depot and then back to 10 West Church Street during this time.

18.    I have reviewed GPS data for the personal phone of NICHOLAS OR-SINI, the defendant, video surveillance, and store receipts and learned that, in the morning on or about May 3, 2020, GPS data shows NICHOLAS's phone traveling to the Home Depot in the Town of Fishkill, video surveillance shows the ORSINIS' GMC pulling into the Home Depot parking lot and a white man consistent with NICHOLAS getting out of the GMC and walking into the Home Depot, purchasing a large amount of firewood at approximately 9:50 am, and then getting back into the GMC and driv-ing away. A Home Depot receipt shows that, at approximately 9:50 am, there was a cash purchase of 16 bundles of firewood.

19.    I have reviewed call detail records and cell-site data for the personal phone of JAMIE ORSINI, the defendant, audio recordings maintained by law enforce-ment, and data from a Middletown storage facility and learned that, on or about 10:52 am and again at or about 11:29 pm, on or about May 3, 2020, JAMIE called the Marlboro, New York, police department and asked about Steven Kraft. According to cell-site data for JAMIE's personal phone, JAMIE's personal phone traveled to and from the Middletown storage facility twice; according to entry-code data from the storage facility, JAMIE's entry code was used to enter the facility at approximately 12:25 pm, leave the facility at approximately 12:31 pm, enter the facility at approxi-mately 8:02 pm, and leave the facility at approximately 8:05 pm.

20.    I have spoken with law enforcement officials, and reviewed documents, and learned that, on or about May 4, 2020, law enforcement officials from the Town of Marlboro Police Department found Steven Kraft's Camry parked—with tickets—

---

[13] I know that an angle grinder with a grinding wheel can be used to cut through hard objects.

on the corner of Third Street and Carpenter Avenue in the City of Newburgh, New York, and impounded the Camry. They found Kraft's J3 phone in the center console of the Camry.

21.    I have spoken to other law enforcement agents about an interview with JAMIE ORSINI, the defendant, listened to an audio recording of that interview, and reviewed documents related to that interview, and learned that, on or about May 6, 2020, New York State Police investigators interviewed JAMIE at 10 West Church Street, and obtained permission to search her phone. According to call detail records for JAMIE's personal phone, after investigators left, JAMIE called the father of her sister's child—who works across the street from the Middletown storage facility—twice: once for 27 minutes and once for an hour and 27 minutes. According to call detail records for JAMIE's personal phone and a recording from the New York State Police, shortly after JAMIE's second call to the father of her sister's child, JAMIE called the New York State Police to ask about the effect of the consent-to-search form she had signed.

22.    I have reviewed GPS and cell-site data, and spoken with law enforcement agents, and learned that there is probable cause that, on or about May 7, 2020, NICHOLAS ORSINI and JAMIE ORSINI, the defendants, concerned about the investigation into Steven Kraft's disappearance, went back to check on the Camry that they had dumped in the City of Newburgh after having stolen it from Kraft and murdered Kraft. In particular: I have spoken with New York State Police investigators, who explained that, on or about May 7, 2020, they returned to 10 West Church Street to speak further with the ORSINIS, who gave them the card of an attorney in Poughkeepsie, New York. According to GPS data and cell-site data for the ORSINIS' personal phones, the phones moved from 10 West Church Street (which is on the east side of the Hudson River) to an area of Poughkeepsie (which is also on the east side of the Hudson River) near the lawyer's office, and then, afterward, traveled to the City of Newburgh (which is on the west side of the Hudson River), and went down Robinson Avenue, including by Robinson and Third Street, and then immediately traveled back to 10 West Church Street. I have spoken with New York State Police investigators who have gone to Robinson Avenue and Third Street, and they have told me that, from that point, one could clearly see the area of Third Street and Carpenter Avenue where Kraft's Camry was recovered. I have spoken with the New York State Police investigators who spoke with JAMIE the day before and who approached the ORSINIS that morning, and reviewed the audio recording of that interview as well as the audio recording of JAMIE's call to the police, and learned that nobody told the ORSINIS where Kraft's Camry had been recovered.[14]

_____

[14] A representative of the Marlboro Police Department told JAMIE that the Camry had been recovered in Newburgh, New York, but did not specify where in the city.

23.    I have reviewed cell-site and GPS data from the personal phones belonging to NICHOLAS ORSINI and JAMIE ORSINI, the defendants, surveillance video, store receipts, license-plate-reader data, text messages, and call-detail records, and learned that there is probable cause to believe that, on or about May 9, 2020, the ORSINIS drove to and from Amsterdam, New York, leaving their personal phones behind. In particular:

a.    According to GPS and cell-site data for the ORSINIS' personal pones, both phones remained at 10 West Church Street during the relevant hours of the day on May 9, 2020.

b.    According to a license plate reader in Saugerties, New York, at approximately 1:57 pm on or about May 9, 2020, the ORSINIS' GMC was seen traveling northbound on I-87. According to video surveillance and a receipt from a Wendy's in Amsterdam, at approximately 3:40 pm, the ORSINIS' GMC pulled into the Wendy's drive-thru, and a man in the driver's seat ordered a large amount of food. According to surveillance footage from a Walmart in Amsterdam, at approximately 4:15 pm, the ORSINIS' GMC entered the Walmart's parking lot. According to a license plate reader in Saugerties, New York, at approximately 10:09 pm, the ORSIIS' GMC was seen traveling southbound on I-87.

c.    According to cell-site data for the 2891 burner phone (now using the phone number ending in 4921), the 2891 burner phone was used in Amsterdam at approximately 3:53 pm, 4:04 pm, 4:38 pm, and 4:59 pm on or about May 9, 2020; one of the phone calls was to NICHOLAS's mother.

24.    I have spoken with law enforcement officials who told me that, on or about July 8, 2020, they saw a U-Haul moving van outside of 10 West Church Street in Beacon, New York. I have reviewed reports indicating that a U-Haul employee told law enforcement agents that JAMIE ORSINI, the defendant, rented the U-Haul truck on or about July 6, 2020, and listed a new address in Amsterdam, New York.

25.    I have spoken with law enforcement agents who searched 10 West Church Street, in Beacon, New York, pursuant to a court-authorized search warrant, on or about August 6, 2020, and reviewed reports and documents related to that search, and learned that law enforcement agents located, among other things, blue latex gloves, similar to the gloves worn by the man identified above as NICHOLAS ORSINI, the defendant, on the walk from where he dumped Steven Kraft's Camry on or about April 28, 2020, to the Sunoco Gas Station in the City of Newburgh, New York. I have spoken with the property manager for 10 West Church Street, who told me that, on or about August 7, 2020, JAMIE ORSINI, the defendant, contacted the property manager and asked about where in the apartment the police searched, and also told the property manager that her ex-husband got in his car like he normally does after he let the girls out and went on his way. (This conflicts with what JAMIE told the New York State Police investigators on May 6, 2020: that, after Kraft let the

children out, JAMIE spoke with Kraft outside of 10 West Church Street for 45 minutes to an hour before Kraft left. This also conflicts with what a Marlboro Police Officer told me JAMIE told him: that Kraft had stayed 10 to 15 minutes after dropping his daughters off).

26.     I have spoken with law enforcement agents who searched the new address for NICHOLAS ORSINI and JAMIE ORSINI, the defendants, in Amsterdam, New York, pursuant to a court-authorized search warrant, on or about August 7, 2020, and reviewed reports and documents related to that search, and learned that law enforcement agents located, among other things, a Levi's Stadium baseball cap and a patterned blue bandana, similar to the Levi's Stadium baseball cap and patterned blue bandana worn by the man identified above as NICHOLAS ORSINI, the defendant, on the walk from where he dumped Steven Kraft's Camry on or about April 28, 2020, to the Sunoco Gas Station in the City of Newburgh, New York.

**WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of JAMIE ORSINI and NICHOLAS ORSINI, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.**

Joseph Merla
Investigator
New York State Police

Sworn to before me this
9th day of June, 2023

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

18