UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
UNITED STATES OF AMERICA,

23 CR 402 (PMH)

-vs-

JURY SELECTION

JAMIE ORSINI and NICHOLAS ORSINI,

Defendant(s).
--------------------------------------x

United States Courthouse
White Plains, New York

Tuesday, September 17, 2024
10:00 a.m.

Before: THE HONORABLE PHILIP M. HALPERN,
District Judge

A P P E A R A N C E S:

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
MICHAEL MAIMIN,
KAIYA ARROYO,
Assistant United States Attorneys

AVRAHAM MOSKOWITZ
DONALD YANNELLA,
Attorneys for Defendant Jamie Orsini

KOFFSKY & FELSEN
Attorneys for Defendant Nicholas Orsini
BY: BRUCE KOFFSKY

ANDREW G. PATEL,
Attorney for Defendant Nicholas Orsini

THE DEPUTY CLERK: All rise.

Hear ye, hear ye, hear ye, all persons having business with the United States District Court for the Southern District of New York draw near, give your attention, and you shall be heard. God save these United States and this Honorable Court, the Honorable Philip M. Halpern presiding.

Please be seated.

THE COURT: Good morning, everybody. My name is Philip Halpern, I'm the Judge, and I'll be presiding over the case. I want to make a few remarks before we start.

You should know that this Court, the United States District Court for the Southern District of New York, is sometimes referred to as the Mother Court as it was the first court established under the judiciary-act of 17 89 and after our United States Constitution came into force. In fact, today is Constitution Day, so in our Sister Court in Manhattan, there are some original documents being displayed to the public today. It's quite fascinating. Unfortunately, we're all here and they're there so we won't get to see them.

Our court pre-dates the United States Supreme Court by a few months. Our Court held its first session on the first Tuesday in November 1789 and Judge James Dwayne presided that day. Our Court has also become the respected gold standard for trial courts around the United States throughout its long history as it's stayed open and operational during wars,

depressions, in the aftermath of the September 11th terrorist attacks, and even during the recent COVID-19 pandemic.

I mention the pandemic, so I'll briefly explain the reason I've asked you all to wear masks this morning.

Although the masks are not required elsewhere in the courthouse, in light of the COVID-19 pandemic, I want to be sure to protect you as well as all the trial participants. If anyone were to end up with a positive COVID-19 diagnosis once we've empaneled the jury and trial's underway, we could have to start all over again, including picking a new jury, so when I have more than 35 people in my courtroom, I ask the potential juror panel to wear a mask. Once we select our jury and the trial begins, of course, you'll be able to remove your masks.

Jury trials are fundamental to our system of justice which, despite its imperfections, is the envy of the world. As such, jury trials are also a part of the American democracy. Citizen jurors such as yourselves, not judges, decide the outcome of civil and criminal disputes. The right to a trial by jury is so important that it is enshrined in both the Sixth and Seventh Amendments to our Constitution.

Each of you in this room has responded to the call to serve, and this is a very important thing. What you're doing is sending a message to your family and your friends and the larger community that you want the cherished American institution of trial by jury to continue. We're here this morning to select a

jury in a criminal case. Through this process, we will choose 12 jurors and 4 alternates who will hear and decide this case.

Let me introduce you to some of the trial participants.

The Government here is represented by Assistant United States Attorneys Kaiya Arroyo, Michael Maimin, and Kathryn Wheelock. Also with them is Shannon Becker, a paralegal in the United States Attorney's Office.

You can stand, just...show your faces. Thank you.

There are two defendants in this case, Jamie Orsini and Nicholas Orsini. Jamie Orsini is represented by Donald Yannella and Avraham Moskowitz. Also with them is their paralegal Ben Zion Moskowitz. Nicholas Orsini is represented by Bruce Koffsky, Andrew Patel and Julie D'Almeida. Also with them is a paralegal, Lindsey Sullivan.

Would you call please stand. All right, thank you.

This trial could take somewhere between two and three weeks. Unexpected events can also occur in a trial and it is possible that the presentation of evidence and jury deliberations could take a little longer, but I seriously doubt it.

We'll sit from nine-thirty to five each day with the exception of Tuesdays. We'll adjourn early at 3:15. We'll take an hour break for lunch, with shorter breaks in mid morning and mid-afternoon, and we will not sit on Fridays because of other

court business, and as well, the Jewish holidays begin October 3rd and 4th and we would not sit on those days.

Our purpose now is to make sure we have a jury of citizens who will decide the issues in this case fairly and impartially and without any bias, prejudice, or sympathy for or against either side. To make sure we do that, I'm going to ask you certain questions about your personal background, your family, your beliefs and attitudes about certain matters, how you're employed, and so forth. You're required to give true and complete answers to my questions. It's not my intention, of course, to pry into your lives. We just want to make sure that we select fair and impartial jurors who can listen to the evidence with an open mind and decide the case based only on the evidence and my instructions to you about the law.

If you have an answer to any questions that, for obvious reasons, is private such that you do not want to answer it in public, please let me know and I'll hear you over at the sidebar, though, I can assure you virtually all of these questions should be answered from your seat in the jury box.

So that you can understand the reason for the questions that I'll be asking you, I'll now tell you about the charges in this criminal case.

The defendants are Jamie Orsini and Nicholas Orsini. The defendants have been charged with the commission of federal crimes in a document called an indictment, filed by a grand jury

sitting in the Southern District of New York. The indictment is not evidence itself. It simply contains the charges against the defendants that the Government is required to prove to the satisfaction of the jury beyond a reasonable doubt. Those of you selected to sit on this jury will receive a detailed explanation of the charges at the conclusion of this case.

I'll now give you a summary of the charges in order to determine whether there's anything about the nature of this case that may make it difficult, or inappropriate, for any of you to serve on the jury in a fair and just manner.

The Indictment consists of two counts, or two charges.

Count One alleges that on or about April 28, 2020, Defendants, with the intent to cause death and serious bodily harm, knowing took a motor vehicle that had been transported, shipped, and received in interstate commerce and foreign commerce from the person and presence of another by force and violence and by intimidation and did aid and abet the same and death resulted, to wit, defendants killed Steven Kraft and drove his car from Beacon, New York, to Newburgh, New York.

Count Two alleges that from April 26, 2020, up to and including April 28, 2020, defendants, together with others known and unknown, knowingly and willfully did conspire and agree together and with each other to commit one or more offenses against the United States, to wit, 18 U.S.C. § 2119. It was a part and object of the conspiracy that defendants, together with

others known and unknown, with the intent to cause death and serious bodily injury would and did knowingly take a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, in violation of 18 U.S.C. § 2119.

That's all I need to say at this point. If you get selected as a juror, you'll hear much more in short order.

Let's talk about your role as jurors.

If you're selected as a juror, your job as jurors will be to decide questions of fact, that is, to decide any disputed issues. You will be the only judges of the facts. Nothing I say or do or the lawyers say or do can interfere with your role as the exclusive finders of fact. In fact, it's not up to me to decide what happened. I have no opinion about that. If you get the impression from anything that I say or do that I do have an opinion about the facts, you must disregard it. We have jurors to decide such things as this because we trust your common sense, and your common sense certainly is as good as my common sense. When it comes to the law, however, you must take your instructions from me and you are bound by those instructions. You may not substitute your own ideas of what the law is or what you think it should be.

Now, I'll explain a few basic and simple rules of law that must guide all of us during this trial.

As I've just told you, the charges in this case are contained in an indictment. The indictment was voted by a grand jury, and it is the way the Government brings people in to court who the Government claims have violated the law. The indictment itself is not evidence of the defendants' guilt. It does not change in any way the presumption of innocence that the law gives every accused person at a trial.

The defendants are presumed to be innocent of the charges contained in the Indictment, and this presumption remains in their favor on the charges at all times throughout the trial unless and until the Government has proved each and every element of the charges beyond a reasonable doubt. If, after full consideration of the evidence presented and following the rules of law that I will explain to you, you have a reasonable degree as to the defendants' guilt as to a particular count, you must acquit them on that count, that is, find them not guilty. If, however, after careful consideration of all the evidence presented and following the rules of law that I will explain to you, you have no reasonable doubt as to the defendants' guilt on a particular count, you must convict that defendant on that count, that is, find him or her guilty.

In a criminal case, the burden of proof remains with the prosecution. For the jury to return a verdict of guilty against the defendant, the prosecution must prove beyond a reasonable doubt that a defendant is guilty. A person charged

with a crime has absolutely no burden to prove that he or she is not guilty. Indeed, a defendant in a criminal case has a right not to testify. If the defendant does not testify, the jury may not draw any inference against the defendant based on that decision. The fact that a defendant chooses not to testify may not enter into the jury's deliberation at all.

At the end of the case, your job will be to determine, in accordance with my instructions, whether the Government has proven the defendants guilty of the charges in the indictment beyond a reasonable doubt. The question of punishment is for me alone to decide, and the jury may not consider possible punishment when it is deciding whether the Government has carried its burden of proving the defendants guilty beyond a reasonable doubt.

You also may not make your decision on the basis of suspicion or sympathy or prejudice, nor upon bias, prejudice, or preconceived notions of any kind that you may have about any group of people. You may not consider any personal feelings you may have about a defendant's race, religion, national origin, sex, sexual orientation, or age. You're required by law to make your decision based solely on the evidence or lack of evidence presented here in my courtroom.

We all have or have had feelings, assumptions, perceptions, fears, and stereotypes, also known as biases, about people and places that have affected our memories, our thoughts,

what we see or hear, and/or the decisions we make or have made. Some biases we are aware or conscious of and others we may not be fully aware of, which is why they're called implicit biases or unconscious biases. Unconscious or implicit biases are stereotypes, attitudes, or preferences that we express without conscious awareness, control, or intention. Like a conscious bias, unconscious or implicit bias, too, can affect how we evaluate information and make decisions.

It's important that if you are selected as a juror, you must discharge your duties without discrimination, meaning that bias or stereotypes regarding the race, color, religious beliefs, national origin, sexual orientation, gender identity or gender of the defendants, any of the witnesses, or the lawyers will play absolutely no role in the exercise of your judgment throughout this trial. You're to be guided solely by the evidence in this case and the crucial question that you must ask yourselves is, where do you find the truth. The only victory in any case is where the truth has triumphed. If it has, then justice has been done. If not, justice will not have been done. You are to determine the guilt or innocence of the defendants solely on the basis of the evidence and subject to the law as I will charge you.

As you've heard, the charges in this case relate to crimes involving a carjacking resulting in death. Most people have at least some opinion about these things. When I ask you

questions, I'll be trying to determine whether because of some personal belief or experience of yours or of a close friend or relative you have an attitude that would interfere with you giving a fair trial to these defendants, or the Government, in a case allegedly involving such things. The question is not what you think about those topics. The question is whether you can be fair and impartial in deciding whether or not the Government has proven beyond a reasonable doubt that the defendants did what they are accused of doing.

Before we proceed with the jury selection process, I must give you some additional important instructions.

First, it is important that you do not discuss this case with anyone during the jury selection process. That includes members of your family, friends, people you work with, and the other potential jurors sitting around you. Don't talk about the case at all or post about it on social media.

Next, you're not to read anything from any outside source or do any of your own research during jury selection. Don't look anything up. Don't google anyone or anything related to the case. I know it's hard in this day and age not to go to the internet when you're curious about something, but I cannot emphasize enough how important it is that you not do any form of outside research about this case during this process.

Those of you who are sitting in seats numbered 1 through 36 in my jury box and to my right as I face you are

sitting in what I will call the virtual jury box. In a minute, I'll ask you to respond to my questions. Now, initially, I'm going to direct my questions to the 36 of you in the virtual jury box. However, if any one of the 36 is excused, the person seated in seat number 37 will come in as one of the potential jurors into the virtual jury box. I'll then ask that person, without repeating all of the prior questions, whether any of my questions called for a yes answer or an explanation on his or her part. If any other potential jurors are excused, I'll do the same with the next numbered juror. Eventually we'll get to the point where there are 36 qualified jurors, which is the number we need to select for a jury of 12 and 4 alternates in this criminal case.

Because any one of you in the courtroom may be needed to take your place in the virtual jury box, I need all of you to listen carefully to the questions. There are two sets of questions.

The first set of questions are about the case and any experiences that you may have had that might affect your ability to serve as a juror in this case. I'll ask these questions out loud to the group. If you have a yes answer to any of these questions, raise your hand and my courtroom deputy, Mr. Frankel, will bring you the microphone, and then I may ask you some follow-up questions. The second set of questions consists of basic background questions about you, your occupation,

education, family, and the like. Both sets of questions will be on a list that my courtroom deputy and my law clerk will now distribute to you.

So let's get the questionnaires out.

Now, one comment just so you understand.

Tabitha's our court reporter and you see she has earphones, and it may be counterintuitive, but she doesn't hear ambient noise, she only hears what goes through headphones and so we have to use a microphone to record your answers, so if you don't mind, if you have a yes and we need to engage in a discussion, please wait for the microphone before you begin to answer, okay?

Now, please don't assume anything from the questions asked because the mere fact that these questions are asked has no bearing on the evidence in this case. During the questioning, you may be excused from serving as a juror in this case for cause. That just means you're not qualified to sit as a juror as a matter of law in this case. Others of you may be later excused based on peremptory challenges. That just means that one of the attorneys will ask to have you excused without giving any reason.

As you can well imagine, responses to a few questions cannot give a complete picture of you as a person. Therefore, being excused is not a reflection on you as a citizen or a person; it's just how our system works. You'll have done your

duty by your presence and your readiness to serve if you are chosen. And, by the way, if you're excused, you're simply going to go back downstairs to the jury assembly room and wait for the next panel of jurors to be called by another judge in the building. When appropriate, I'll ask you to give your answers to my instructions using the microphone which Mr. Frankel will hand to you to be sure everyone can be heard.

All right, Mr. Frankel, let's swear in the panel, please.

THE DEPUTY CLERK: Can the panel please rise and raise your right hand.

THE COURT: Everybody. Everybody.

THE DEPUTY CLERK: Yeah, in the back, too.

You and each of you do solemnly swear or affirm that you will give true answers to all questions as to be put to you touching upon your qualifications to serve as jurors in this cause, so help you God.

ALL: Yes.

THE DEPUTY CLERK: Thank you. Please be seated.

THE COURT: All right, ladies and gentlemen, our virtual jury box now consists of jurors 1 through 36. Before we go to the questions, and this is just, again, for jurors 1 through 36, is there any potential juror in the virtual jury box who has serious commitments that would interfere as a juror on a trial that will likely go for two to three weeks?

Before you raise your hand, jury duty is an imposition on your ordinary lives and so while I appreciate it interrupts your life, you know, unless it's extraordinary, I will have you remain.

Also, in that regard, is there anyone with a physical or mental or psychological personal problem that would prevent you from serving on the jury? If the answer to any of these questions is yes for the first 36, please raise your hand.

Let's just start. Juror No. 1.

PROSPECTIVE JUROR: Good morning. No, I'm racist and biased of all above. I grew up in Yonkers and that's, you know, the way I am. I went through this and I even wrote a letter in the beginning before I came here.

THE COURT: I'm not sure I understand what you're saying to me. You're racist and biased.

PROSPECTIVE JUROR: Yes.

THE COURT: Is that a...predisposition? You haven't heard a word about any of this and you're telling me you're racist and biased? What does that mean to me? You can't be fair and impartial?

PROSPECTIVE JUROR: I mean, that's the way I am. That's the way I grew up. I mean, if you want to go into details in the neighborhood I grew up, uh...

THE COURT: You gotta keep the mic close to you, so I can hear you?

PROSPECTIVE JUROR: You want to go into details of the neighborhood I grew up?

THE COURT: No, I understand you grew up in a, I assume, a tough neighborhood in Yonkers --

PROSPECTIVE JUROR: Yeah, exactly.

THE COURT: -- and so as a result of your life experience, you have a point of view, but that doesn't, that doesn't absolve you from jury duty.

All right, thank you for that.

Next, Juror No. 5.

PROSPECTIVE JUROR: Yeah, number --

THE COURT: Hold on, hold on, hold on, please.

Yes.

PROSPECTIVE JUROR: Yeah, no. 14. I've had dealings with the Southern District of --

THE COURT: Well, hold on, hold on. Let's get to the questions, okay? We're not doing this any way except my way, which is, do you have an obligation or personal problem that prevents you from sitting on the jury.

PROSPECTIVE JUROR: Yes.

THE COURT: Forget your answer to the questions for a minute, okay?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: Okay, what is it.

PROSPECTIVE JUROR: I've dealt with the U.S.

Attorney's in some Title VII lawsuits, and in one of 'em, I would have to say I felt they lied about something, so I'm really not too fond of them.

THE COURT: Well, you don't have to like them. That's okay.

PROSPECTIVE JUROR: No, I'm just letting you know.

THE COURT: That's okay. I appreciate it.

PROSPECTIVE JUROR: You know...just letting you know.

THE COURT: Okay. Thanks for that.

Juror No. 4.

PROSPECTIVE JUROR: I'm just curious about the timing of the trial. I have a cruise October 21st.

THE COURT: You'll be fine. Don't worry.

PROSPECTIVE JUROR: It won't -- okay.

THE COURT: My next trial starts October 7th.

PROSPECTIVE JUROR: Oh, that's good to know. Okay.

THE COURT: So these lawyers, they won't be happy if they're seeing me after October 6th. Trust me.

PROSPECTIVE JUROR: Okay.

THE COURT: All right, yes. Juror No. 12.

PROSPECTIVE JUROR: You just answered the second question for me. I have a wedding I'm going to be attending coming up in October and first, I was a victim of a crime decades ago and was not satisfied with the way things went, so --

THE COURT: All right, we'll come to that question when we do.

PROSPECTIVE JUROR: Okay.

THE COURT: Right now, we're just trying to get through the dates, all right?

PROSPECTIVE JUROR: Okay.

THE COURT: You'll raise your hand when that question arises.

All right, Juror No. 16. Lively bunch this morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning.

PROSPECTIVE JUROR: I have some childcare conflicts, potentially, with the timing of the days. I have two young kids and my partner is in the medical field and so early mornings, late nights, and I'm their primary transportation so we're having to hire a lot of help because we're not from the area, don't have family.

THE COURT: Well, you have help for the kids, right? I mean...

PROSPECTIVE JUROR: We do, but it's a day-care service, so I have to, like, get them there in the morning and pick them up and so the timing for -- the closing of the day care is five p.m. -- or, sorry, 5:15.

THE COURT: And where is the day care?

PROSPECTIVE JUROR: The day care is -- it's over in

Rye Brook. Doable potentially, I mean --

THE COURT: All right, I'm going to excuse you because I don't want your kids standing on the street corner while you're here with me.

PROSPECTIVE JUROR: Thank you.

THE COURT: All right? You'll go back to the jury assembly room.

Juror No. 37, who's Juror No. 37? Come on in, you'll sit in Juror No. 16's spot. Just give me a minute.

Okay, all right, I guess the first row, Michael, what juror number are you, sir?

PROSPECTIVE JUROR: Nineteen.

THE COURT: Yes, good morning.

PROSPECTIVE JUROR: May I request a sidebar, please?

THE COURT: Is it absolutely necessary?

PROSPECTIVE JUROR: I don't know. I think it might be.

THE COURT: Okay. All right, we'll have a sidebar, Juror No. 19. Hold it, we only can do one juror at a time so you can put your hands down, we'll come back to you.

So come on up, let's go.

(Discussion at sidebar:

THE COURT: All right, so what's the problem?

PROSPECTIVE JUROR: Well, I have several issues.

My son is federal law enforcement. He's a special

agent. I also -- I worked at Ground Zero for the fire department, I'm a retired firefighter in Yonkers and I suffer from PTSD, and my therapy sessions are Tuesdays from 12 to 1.

I don't know if it matters, but financial hardship also, I bowl twice a week, and --

THE COURT: I'm I mean, bowling isn't going to get you anywhere with me.

PROSPECTIVE JUROR: Well, I pay for that, so it's a financial loss.

THE COURT: All right, tell me about your PTSD and how long have you been going to therapy.

PROSPECTIVE JUROR: It's been about a year, year and a half now. I -- the sessions are Tuesdays and they're from 12 to 1.

THE COURT: Well, I understand, but can you make a session an alternative day? I mean, can you do it on a six o'clock at night or do it on the weekend?

PROSPECTIVE JUROR: I would have to see if the therapist can do that.

THE COURT: All right, why don't you check it out.

PROSPECTIVE JUROR: And I also have osteoarthritis and it -- I'm racked with pain and it hurts me to sit for long periods of time.

THE COURT: You're trying to get out of jury duty and I'm not in favor of people who try to get out of jury duty.

PROSPECTIVE JUROR: I also -- all right. I am -- I also -- I do -- I'm in charge of a big game dinner for my club, I do all the butcher and this is the time of year when everything comes in, so...

THE COURT: All right, thank you for that. I'm going to have you sit back down.

PROSPECTIVE JUROR: All right, thank you, sir.)

(In open court; jurors present)

THE COURT: Unless you really need a personal matter or something of significance, please, let's not have sidebars.

All right, next juror who has a hand up.

Yes, ma'am. Just give me your juror number.

PROSPECTIVE JUROR: Twenty-nine.

THE COURT: Yes, ma'am. Good morning.

PROSPECTIVE JUROR: Good morning.

I am the sole supporter of three children, college age, and I work in a commission-based business so every day I'm not working, I am not able to support my kids.

THE COURT: And I appreciate that it is an interruption of your business life, so -- but I'm going to keep you in place for now. All right, thank you.

Next? Juror number...

PROSPECTIVE JUROR: Twenty-seven.

THE COURT: Good morning.

PROSPECTIVE JUROR: Good morning.

I'm a direct care worker, in fact, I have to work this afternoon, and I work every day about ten hours a day and they don't have anybody, so I really need to be there for this person, for my client.

THE COURT: Yeah, I mean, jury duty interrupts work and so there's not anything I can do to excuse you on that basis.

All right, next, please.

Juror number?

PROSPECTIVE JUROR: Twenty-six.

THE COURT: Yes, good morning.

PROSPECTIVE JUROR: Good morning.

I, I live and care for my elderly father. I'm his sole caretaker. For a few days, he'll probably be okay, but two to three weeks, I don't -- he'll need someone there.

THE COURT: Do you have someone you can substitute?

PROSPECTIVE JUROR: No, my mother's not around and my husband travels for work.

THE COURT: All right, we'll leave you in place for the moment.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you.

PROSPECTIVE JUROR: Good morning.

THE COURT: Juror number.

PROSPECTIVE JUROR: 35.

THE COURT: Yep.

PROSPECTIVE JUROR: I am a teacher, but I teach field trip at a film center in Pleasantville, New York, for third graders, and I am the sole teacher of this field trip and I have students coming next Wednesday and every day thereafter.

THE COURT: Yeah, no, I appreciate it, jury duty gets in the way of work and there's nothing I can do about that.

All right, next person, please.

PROSPECTIVE JUROR: No. 33.

THE COURT: Yes, good morning.

PROSPECTIVE JUROR: Unfortunately we had a death in the family over the weekend. The funeral is scheduled for Friday, which shouldn't be a problem since apparently we aren't sitting on Friday, but the viewing is Thursday afternoon at four o'clock in Guilford, Connecticut.

THE COURT: All right, I'm going to excuse you, Juror No...

PROSPECTIVE JUROR: Thirty-three.

THE COURT: Thirty-three. I'm going to excuse you for a funeral viewing on Thursday afternoon. Juror No. 38 will take your place.

All right.

PROSPECTIVE JUROR: Good morning. No. 32.

THE COURT: Thirty-two, yes, good morning.

PROSPECTIVE JUROR: Yes. I'm traveling from October

11th to November 12th to India, so...

THE COURT: When?

PROSPECTIVE JUROR: October 11th to November 12th.

THE COURT: October 11th?

PROSPECTIVE JUROR: Yes.

THE COURT: Yeah, you're fine, you'll be fine. Don't worry.

PROSPECTIVE JUROR: Okay.

THE COURT: You know, jury duty interrupts things and it's unfortunate that it does, but it's part of our citizenry, it's part of your obligation as a citizen, so I have to, you know, be mindful of that.

All right, in the front, Michael.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning. What juror number, please?

PROSPECTIVE JUROR: Twenty.

THE COURT: Twenty.

PROSPECTIVE JUROR: Yes.

THE COURT: Yes, good morning.

PROSPECTIVE JUROR: I'm a direct care worker, work in a hospital, I work in the night, and for a couple days, it's okay to get a substitute, but I cannot be there for long time.

THE COURT: Yeah, your jury duty gets in the way of your work and your employer can't make you work while you're on jury duty, right? So --

PROSPECTIVE JUROR: That's a --

THE COURT: You have to talk to your employer about it, but that shouldn't interfere with your jury duty, all --

PROSPECTIVE JUROR: So that's --

THE COURT: -- right? That's the law. That's the law. Thank you.

Next?

PROSPECTIVE JUROR: Good morning, Judge.

THE COURT: Good morning.

PROSPECTIVE JUROR: I worked in law enforcement for 35 years before retiring and I'm also on medication.

THE COURT: All right, so the working in law enforcement we'll come to, but being on medication isn't going to stop me from keeping you in your seat.

Is there some other --

PROSPECTIVE JUROR: Okay, perhaps, Judge.

THE COURT: Okay, well, we'll talk about it as we get further along.

PROSPECTIVE JUROR: Okay.

THE COURT: The medication is for what?

THE DEFENDANT: Overactive bladder.

THE COURT: I see.

MR. YANNELLA: What juror number is this, please.

THE COURT: This is juror no. 17.

PROSPECTIVE JUROR: Seventeen.

THE COURT: I see. Is that a condition that's going to get in the way of you remaining in the courtroom for extended periods?

PROSPECTIVE JUROR: I don't want it to, you know.

THE COURT: All right. All right, well, we'll leave you in place for now. Thank you.

Juror No. 16. You just got here.

PROSPECTIVE JUROR: I just wanted to say that I'm not sure if I will understand all the wording, because when you started to talk in the beginning and you used the complicated terms, I'm not -- I mean, I'm just -- I just want to mention it.

THE COURT: All right, English is not your first language? What is your --

PROSPECTIVE JUROR: No.

THE COURT: -- first language?

PROSPECTIVE JUROR: Well, Bulgarian.

THE COURT: Okay.

PROSPECTIVE JUROR: I mean, when I read, I understand, but just when you start using the more difficult words, I'm not sure if I will be able to...

THE COURT: All right. Your English is pretty good and you seem okay to me, so...

PROSPECTIVE JUROR: Okay.

THE COURT: But I appreciate you being honest about that. Are we past this part now? I think we are. All right.

So, now, just one rule of thumb. Please, stay on the same page as I'm on, stay on the same question. There's a lot of you, we gotta get through two parts, and so if we stay on the same page together, trust me, this is not my first rodeo, we will get through this more efficiently. If you wander or want to talk to me about question 52 and we're on question 6, it will just become a problem, okay? So, please, let's stay on the same page and we can get through this quickly and efficiently.

Do you have any hesitation or unwillingness to accept the rules and instructions that I have already stated?

Do you have any doubt you'll be able to apply the law as I explain it even if you disagree with it?

Do you have any difficulty reading, speaking, or understanding the English language? Juror 16 has made that point already; anyone else?

Do you have any problems with your hearing or vision that would prevent you from giving full attention to all the evidence at this trial?

Are you taking any medications or do you have any medical conditions that would prevent you from giving full attention to all of the evidence at this trial?

Juror No. 17 mentioned some medication.

Is there anyone here who's not a United States citizen?

Do you have any personal knowledge of the charges in

the Indictment as I have described them to you?

One of the defendants in this case is Jamie Orsini. Do you know or have you had any direct or indirect dealings with Mr. Orsini or with any family member or close family member of Ms. Orsini?

To your knowledge, do any of your family members or close friend know Ms. Orsini?

Jamie Orsini is represented today by Donald Yannella and Avraham Moskowitz, who are attorneys. They'll be assisted by paralegal Ben Zion Moskowitz. Do you know Mr. Yannella or Mr. Moskowitz?

Have you, your family members or close friends had any direct or indirect dealings with Mr. Yannella or Mr. Moskowitz? I guess there's two Mr. Moskowitzes.

The other Defendant in the case is Nicholas Orsini. Do you know or have you had any direct or indirect dealings with Mr. Orsini or with any family member or close friend of Mr. Orsini?

To your knowledge, do any of your family members or close friends know Mr. Orsini?

Nicholas Orsini is represented today by Bruce Koffsky and Andrew Patel and Julie D'Almeida, who are attorneys. They will be assisted by Paralegal Lindsey Sullivan. Do you know Mr. Koffsky, Mr. Patel or Ms. D'Almeida or Ms. Sullivan?

Have you or any of your family members or close

friends had any direct or indirect dealings with Mr. Koffsky, Mr. Patel, Ms. D'Almeida, and/or Ms. Sullivan?

The Government here is represented in all cases where it is a party before this Court by the United States Attorney for the Southern District of New York, who is Damian Williams. The attorneys representing the Government during this trial are Assistant United States Attorney Kaiya Arroyo, Michael Maimin, and Kathryn Wheelock. Do you know Mr. Williams, Ms. Arroyo, Mr. Maimin, or Ms. Wheelock?

Have you or your family members or close friend had any dealings, directly or indirectly, with them?

Assisting Ms. Arroyo, Mr. Maimin, and Ms. Wheelock in this case will be Joseph Merla and Brian McNally who are investigators with the New York State Police, along with Lawrence Caulfield and William Laham who are special agents with the Federal Bureau of Investigation, and Shannon Becker who is a paralegal in the U.S. Attorney's Office. Do you know Investigators Merla, McNally, Special Agents Caulfield and Laham or Ms. Becker?

Have you or any of your family members or close friend had any dealings, either directly or indirectly, with investigators Merla and McNally, Special Agents Caulfield and Laham, or Ms. Becker?

Have you or your family members or close friends have any dealings, either directly or indirectly, with the U.S.

Attorney's Office or the Federal Bureau of Investigation or the New York State Police?

All right, let's start with Juror No. 8.

PROSPECTIVE JUROR: Good morning, your Honor.

THE COURT: Good morning.

PROSPECTIVE JUROR: I'm a retired county police detective and I did work directly with the State Police, and at this point, I'm a volunteer on the Law Enforcement Advisory Board for the SPCA police in Putnam and I deal with a lot of their compliance with the State Police with NYSPN and a lot of their computer stuff where I'm just constantly submitting stuff and correcting it, but, you know, I didn't state it earlier because it's not a paid position and it's not-for-profit law enforcement.

THE COURT: All right, so all of this aside, all of what you're doing, is that going to impair your ability to be fair and impartial here for these individuals?

PROSPECTIVE JUROR: Well, not on that one, sir.

THE COURT: Okay. Thank you.

What else? Juror No. 9. We'll come to you in a minute, sir.

PROSPECTIVE JUROR: Good morning, your Honor.

THE COURT: Good morning.

PROSPECTIVE JUROR: My uncle was a police officer in White Plains. I believe it was different than the New York

State Police, but he may have had interactions with them, so I just wanted to bring that to your attention.

THE COURT: All right, is that going to impair your ability to be fair and impartial here for me in this case?

PROSPECTIVE JUROR: I don't believe so. It may affect me, but I, I don't believe so.

THE COURT: All right, thank you.

All the way in the back, Michael.

Juror No...

PROSPECTIVE JUROR: Thirty-one.

THE COURT: Good morning.

PROSPECTIVE JUROR: Good morning. I've actually testified in front of a grand jury in Manhattan. I don't know if that's relevant, but the question asked if I've had any interaction and I have in the past, so...

THE COURT: Okay. Is that going to impact your ability to be fair and impartial here in this case?

PROSPECTIVE JUROR: I don't believe so.

THE COURT: Okay, thank you.

All right, this happens on occasion, do you know me or anyone else associated with the Court?

Do you know any other members of the jury panel? As you look around the room, do you recognize anybody? That happens too. No?

All right, the following are individuals whose names

may be mentioned during the trial. It's a fairly lengthy list or who may be witnesses in the case, so I'll just read them and we'll go through the list and then I'll ask the question.

Joel Appelbaum, Ranjit Binder, Cam Blythe, Kenneth Burgess, Frank Cricchio, Tina Cricchio, Anthony Cutrone, Anthony Di Salva, Hal Desjardines, Bangaly Diomande, Justin Gray, Anthony Hardisty, Daniel Holler, Kevin Hollis, Richard Hollister, Harry Holloway, Julie Horn, John Hurtado, Tim Jordan, Robert Klein, Kevin Leibach, Monica Lincoln, Ryan Lawrence, Adam Maggs, Caleb Morrow, Erin Manns, Gregory Maxwell, Neftali Monroy, Lana Morrison, Carolyn Murphy, Christopher Nedwetsky, Noreen Orsini, Ji Ho Park, Robert Pendergast, DeLeassa Penland, Daniel Reid, Suede Remington, Foday Saccoh, Jamie Scally, Al Sherman, Jessica Schue, Odessa Simma, Bajan Singh, Michael Sotanski, Joseph Spencer, Jeff Stewart, Natalia Stupak, Matthew Terwilliger, Mae Truong, Robert Van Vost, Timothy Ward, Shanna Whiteman, Kareem Francis, Liam Ronin.

Do you know any of these people; have you had any dealings either directly or indirectly with any of these individuals; to your knowledge have your relatives, friends, associates, employers, employees, had any dealings with any of these individuals?

Do you know or have any association, professional, business, social, direct or indirect, with any member of the staff of the United States Attorney's Office for the Southern

District of New York, the police, New York State Police, the FBI? Is any member of your family member or a close friend employed by any law enforcement agency whether federal, state, or local other than what you've already indicated to us? Other than what you've indicated.

All right, Juror No. 31.

PROSPECTIVE JUROR: I have a family member that is employed by the Bureau of Criminal Investigation, State of New York.

THE COURT: All right. Is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: No, I don't see -- no. I don't believe so.

THE COURT: Okay, thank you.

Juror No...

PROSPECTIVE JUROR: Twenty-four.

THE COURT: Twenty-four, yes, ma'am.

PROSPECTIVE JUROR: My friend's father is a police captain for Mount Vernon.

THE COURT: Okay. Is that going to impact your ability to be fair and impartial here?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Thank you.

Juror No. 8.

PROSPECTIVE JUROR: My son, my brother, my nephew, my

father, we were all police.

THE COURT: All right. Is that going to impact on your ability to be fair and impartial here in this case?

PROSPECTIVE JUROR: Pip, no, I don't have any pre-prejudices.

THE COURT: Terrific. That's all we can ask. No predilections, no preconceived notions, that's what we're looking for, fair and impartial.

There was another hand that went up. No. 4. You're a lively bunch this morning.

PROSPECTIVE JUROR: Hi. My husband was the Manhattan DA, he was a U.S. Attorney, he worked for the U.S. Attorney's Office, he was a social security judge.

THE COURT: All right. Tell me about the U.S. Attorney's Office work; when was that?

PROSPECTIVE JUROR: He worked under Spitzer. He was in the Organized Crime Unit, and then he was head of...the...

THE COURT: In the Attorney General's Office?

PROSPECTIVE JUROR: The U.S. -- I'm sorry, the State's Attorney.

THE COURT: Okay. Because I didn't think Elliot Spitzer was in --

PROSPECTIVE JUROR: No, no, sorry, I got it wrong there.

THE COURT: It was the Attorney General's Office, all

right. Is that going to impact your ability to be fair and impartial here?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Okay, thank you.

All right, have any of you either through any experience -- oh, I'm sorry, I'm sorry. Juror number?

PROSPECTIVE JUROR: Twenty-three.

THE COURT: Yes.

PROSPECTIVE JUROR: My, my husband's brother is in the NYPD. A detective.

THE COURT: All right, is that going to impact on your ability to be fair and impartial?

PROSPECTIVE JUROR: No, I don't think so.

THE COURT: Thank you.

Another one in the back, Michael.

PROSPECTIVE JUROR: No. 35. My son works for the Manhattan DA presently, in the Rackets Bureau.

THE COURT: Is it the going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: I hope not.

THE COURT: Okay, thank you.

Have any of you either through any experience you've had or anything you've seen or read developed any bias, prejudice, or other feelings for or against the U.S. Attorney's Office for the Southern District of New York, the FBI, the New

York State Police, or against any other law enforcement agency?

Juror No. 5.

PROSPECTIVE JUROR: As I said, I had dealings, I've had dealings with these people, so...I'm not too fond of them.

THE COURT: You don't have to like them. The question is -- the concern --

PROSPECTIVE JUROR: No, I don't think I could be. To be honest with you.

THE COURT: Well...fair enough, but you haven't heard anything in this case. You --

PROSPECTIVE JUROR: I'll be honest with you, I have such a disdain for them that I don't think I can be fair with them.

THE COURT: You don't think you can be fair to litigants, not the U.S. Attorney. The U.S. Attorney is not on trial here.

PROSPECTIVE JUROR: To the whole --

THE COURT: Mr. Orsini and Ms. Orsini are on trial here.

PROSPECTIVE JUROR: I, I just don't think I could give 'em a fair assessment of the whole case to be honest with you. Without even hearing it. I have a, I have a disdain for the U.S. Attorneys. And I have a legitimate reason to be. They've lied to -- they've lied in a case of mine.

THE COURT: Okay.

PROSPECTIVE JUROR: And I'm...

THE COURT: All right. I'll tell you what we're going to do --

PROSPECTIVE JUROR: You know, they're capable of lying is what I'm saying.

THE COURT: I'll tell you what we're going to do. We're going to excuse you, you'll go downstairs, you'll report to the next jury panel, and we'll take Juror No. 39.

Come on down. As they say.

You'll report to the jury assembly room for your next assignment. Thank you.

Juror No. 39. All right, welcome.

Now, has there been any question that I've asked so far that you would have said yes to?

PROSPECTIVE JUROR: It's the length of the trial.

THE COURT: I'm sorry.

PROSPECTIVE JUROR: I just had concern with the length of the trial.

I know that employment is interrupted, but I'm a school psychologist in a school with a high, a high population of special education students, and as a psychologist, I'm the one who provides all of the mandated service and the crisis intervention. I just think two to three weeks is a long time for the students to not have their psychological support.

THE COURT: And I appreciate that, but I need to keep

you in place. All right, thank you for that.

Anybody else?

All right, Juror No. 9. You can do no. 12 first and then we'll go back to 9.

Yes, sir.

PROSPECTIVE JUROR: Well, like I said earlier, I was a victim of a crime decades ago and I didn't get a chance to, to get -- to have justice in that case, so now I get a chance to do it here, you know, I'm -- I don't think it will have an impact on how I do it, but I just wanted to let you know that I'm...

THE COURT: And I appreciate your honesty.

PROSPECTIVE JUROR: Okay.

THE COURT: It's not going to be impact your ability to be fair and impartial here, right? You haven't heard anything.

PROSPECTIVE JUROR: I certainly hope so.

THE COURT: Okay. You certainly hope not, right? You meant not.

PROSPECTIVE JUROR: Hope not.

THE COURT: Okay.

PROSPECTIVE JUROR: And, yes, as I said before, I have a relative who's a police officer, who was a police officer, but in addition, at some point in my -- I've had dealings with the, the police force in my town, I live in Hartsdale, and they're very positive actually.

My mother was having a problem, they responded immediately and they were very helpful, so I -- generally my -- just to bring it to your attention, I, I am concerned that I may be inclined to take what an officer says...and give it more weight than...

THE COURT: All right, but the law that I'll instruct you on --

PROSPECTIVE JUROR: Mm-hmm.

THE COURT: -- is that you are not entitled to give a police officer any more weight. Police officers, agents, are human beings and they get the same weight that you would want to be given if you were testifying, so that rule is a strict rule and I just want to be certain of two things: one, you'll follow my instructions...

PROSPECTIVE JUROR: I will.

THE COURT: Yes?

PROSPECTIVE JUROR: Yes.

THE COURT: And two, the fact that you -- the police were kind to your mom, and I can understand you being receptive to that or appreciate of that.

PROSPECTIVE JUROR: Mm-hmm.

THE COURT: That is not going to impact on your ability to be fair and impartial here, is it?

PROSPECTIVE JUROR: No. No, it will not.

THE COURT: All right, thank you.

Okay, have you or has any family member either as an individual or in the course of business ever been a party to a legal action or dispute with the United States or with the officers, departments, agencies, or employees of the United States, including the Internal Revenue Service? Well, let's good. Okay.

Have you had any legal, financial, or other interest in any such legal action or dispute or its outcome?

Have any of you or a family member ever had such a dispute concerning payment of money owed to you by the Government?

Do you or does a relative or close friend work for or with any federal state or local law enforcement agency such as the FBI, the police, or the sheriff's department, District Attorney's Office, or the United States Attorney's Office, other than what you've already told us?

Are you employed by or have you any relatives or close friends who are connected to anyone employed by the office of the United States Attorney for the Southern District of New York, any District Attorney's Office, the New York State Police, or any agency of a federal, state, or local government? Other than what you've already told us.

Have you sought -- ever sought such employment?

Have you ever been employed by a law enforcement agency or had law enforcement duties either as a civilian, in

civilian or military life, other than what you've told us already?

Do you have any special training or expertise in law enforcement matters? Again, as a corollary to what you already told us.

Have you attended law school or had any legal training?

Juror No. 9.

PROSPECTIVE JUROR: I think this sort of wraps into the next question; I'm a litigation paralegal.

THE COURT: All right. Is that going to impact on your ability to be fair and impartial here in a criminal case?

PROSPECTIVE JUROR: Um, I haven't -- I'm not sure, to be honest with you, because I don't know the details of the case at all, but...

THE COURT: Right. Can you have an open mind such that you'll listen to all of the evidence --

PROSPECTIVE JUROR: Yes.

THE COURT: -- from the Government and from the defendants, and not make up your mind until I engage the jury to go deliberate?

THE DEFENDANT: Yes.

THE COURT: All right, thank you for that.

Anyone else?

Are any of you, your relatives or close friends

judges, lawyers, law students, paralegals, or legal secretaries other than what you've already indicated?

PROSPECTIVE JUROR: I'm no. 24. My cousin is a lawyer and I work in a law school.

THE COURT: Okay. Are those facts going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: I don't think so.

THE COURT: All right, thank you.

Juror No. 19 I think it is?

PROSPECTIVE JUROR: Yeah, I just forgot to mention, my brother-in-law's also an investigator with the Inspector General's office in New York City.

THE COURT: All right, is that fact going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: I guess not.

THE COURT: All right. Thank you.

Have you ever served as a juror in any court? Juror No. 3.

PROSPECTIVE JUROR: Yes, I have. I've served on a jury here twenty-something years ago.

THE COURT: Was it a criminal or civil case?

PROSPECTIVE JUROR: It was a civil.

THE COURT: Without telling me the verdict, did the jury reach a verdict?

PROSPECTIVE JUROR: They did.

THE COURT: Is it going to impact -- that experience going to impact on your --

PROSPECTIVE JUROR: No.

THE COURT: -- ability to be fair and impartial here?

PROSPECTIVE JUROR: No.

THE COURT: All right, thank you.

PROSPECTIVE JUROR: I also served in Poughkeepsie. On a criminal case.

THE COURT: All right, same question.

PROSPECTIVE JUROR: They did come to a verdict.

THE COURT: And is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: No, no.

THE COURT: All right, thank you for that.

Juror No. 4.

PROSPECTIVE JUROR: I served twice at the county courthouse here in White Plains. The first was --

THE COURT: Criminal or civil case, ma'am?

PROSPECTIVE JUROR: The first was a civil case, came to a verdict.

THE COURT: And the other one was?

PROSPECTIVE JUROR: And the other one, I was on -- it was settled before we even...

THE COURT: Are those experiences going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: No.

THE COURT: All right, thank you for that.

Juror No. 5.

PROSPECTIVE JUROR: I served on a jury. It was a property dispute case and they did come to a verdict.

THE COURT: All right. Is that going to impact on your ability to be fair and impartial for me here?

PROSPECTIVE JUROR: No.

THE COURT: No. Thank you. All right.

Juror No. 19, yes.

PROSPECTIVE JUROR: I don't, I don't know which question, but it was also -- I forgot to mention, I was involved with a grand jury. I, I witnessed and videotaped a police-involved shooting.

THE COURT: Okay. When you say you were involved with a grand jury, were you a witness in the grand jury?

PROSPECTIVE JUROR: I was a witness, yes.

THE COURT: All right. Is that experience going to impact on your ability to --

PROSPECTIVE JUROR: I guess not.

THE COURT: -- be fair and impartial here?

PROSPECTIVE JUROR: I guess not, your Honor.

THE COURT: Okay.

Juror No. 21.

PROSPECTIVE JUROR: Twenty-one. I served on two

juries in the federal building in Manhattan. Both were civil and both reached a verdict.

THE COURT: All right. Are those experiences going to impact on your ability to be fair and impartial for me here? Ma'am?

PROSPECTIVE JUROR: No, they won't impact. Oh, no, they won't impact, sorry.

THE COURT: All right.

Anyone else? I thought I saw one more hand. Nope, okay.

The question goes on, have you ever served as a grand juror. Juror No. 19 served as a grand juror.

Have any of you or any of your relatives or close friends ever been involved or appeared as a witness in any investigation by a federal or state grand jury or by a congressional or state legislative committee, licensing authorities or governmental agency, other than what you've indicated already?

Have you or anyone close to you ever been questioned in any matter by federal, state, or local law enforcement agency other than what you've indicated already?

Have any of you ever been a witness or a complainant in any federal or state prosecution? Again, other than what you've already indicated.

Are you or has any member of your family now under

subpoena or, to your knowledge, about to be subpoenaed in any criminal case?

Have you or has any member of your family or any associate or any close friend ever been charged with or investigated for a crime other than what you've indicated?

Other than being pulled over for a traffic violation, have you or any of your close friends or relatives ever been stopped or questioned by any member of the New York State Police or the FBI?

Have you or any of your close friends or relatives ever been a victim of a crime other than what you've indicated?

Juror No. 9.

PROSPECTIVE JUROR: Yes, I have a relative who picked up a hitchhiker. The person stabbed him, tied him up. And threw him out of the car off the side of the highway and stole his car. He was picked up and he survived, but, you know, he kind of lost touch with our family after that.

He was very close to my mother in particular, so it's something she would very often, I mean, even in the last week, has mentioned to me, so I think that is...it's just a significant experience in my life. It's something that would possibly affect me, I believe.

THE COURT: Is it going to impact, though, on your ability to be fair and impartial here?

PROSPECTIVE JUROR: To be honest, I, I think it might.

I think it would.

THE COURT: Tell me about it.

PROSPECTIVE JUROR: So his name --

THE COURT: Don't give --

PROSPECTIVE JUROR: Oh, okay. He was a cousin of my mother. He -- like I said, he picked up a hitchhiker --

THE COURT: Yeah, I got that.

PROSPECTIVE JUROR: -- he was assaulted, but it's something that, like, my mom would always talk to me about, very -- even -- I mean, it's very silly example, your Honor, but we watched the NFL, there's a commercial, a pizza commercial with George Kittle and Amon-Ra St. Brown, and he said "I accept rides from strangers." Even just the other day, she was saying, you know, never ever do that, I always say to people, I always tell the story, so I think it's something, like...

THE COURT: In the forefront of your mind?

PROSPECTIVE JUROR: Exactly.

THE COURT: And you don't think you can divorce yourself from those thoughts to be fair and impartial to these individuals here?

PROSPECTIVE JUROR: I don't think -- I would obviously try, I would obviously take direction, you know, follow what you say the law is, but I do -- I know you mentioned things like implicit bias. I do think that there is something in me that I would...

THE COURT: All right. Fair enough.

PROSPECTIVE JUROR: Be inclined --

THE COURT: I'm going to excuse you and send you back downstairs, Juror No. 9.

Juror No. 40, come on in.

We'll come to you in a minute; relax.

PROSPECTIVE JUROR: Your Honor, no. 40.

THE COURT: Sit down, one thing at a time.

Okay, now, Juror No. 9, is there any answer to a question that I've already asked that you would answer yes to?

PROSPECTIVE JUROR: Yes, your Honor.

THE COURT: All right, tell me about it.

PROSPECTIVE JUROR: I have ADD, attention deficit disorder. I think I've already -- you can ask no. 41, I've been bouncing my leg and I've been looking around, I can't really --

THE COURT: Well, ADD, as I understand it, do you take meds for it?

PROSPECTIVE JUROR: I am off my medication right now. I'm in between sub -- prescriptions.

THE COURT: How long have you been off your meds?

PROSPECTIVE JUROR: About two weeks now.

THE COURT: Is it that you're changing meds?

PROSPECTIVE JUROR: Yes.

THE COURT: And when do you start your new meds?

PROSPECTIVE JUROR: I have an appointment the 25th of

September.

THE COURT: Do you think you'll have trouble sitting and paying attention?

PROSPECTIVE JUROR: Yes, yes, your Honor.

THE COURT: All right I'm going to excuse you.

Juror No. 41, come on down.

All right, Juror No. 9, now you're no. 9, is there any question I've asked that you would answer yes to so far?

PROSPECTIVE JUROR: Oh, yes.

THE COURT: All right, tell me.

PROSPECTIVE JUROR: Regarding no. 32, my nephew got shot in the head in front of our house. I'm sorry. They just called me and it's an overseas call from the Philippines, and they told me one of your nephew was just shot in the head and he was just laid down in front of our house. I just don't know what to do.

THE COURT: Is that going to impact on your ability to be fair and impartial here in this case?

PROSPECTIVE JUROR: Yes.

THE COURT: I think it would, too. Okay, you're excused.

PROSPECTIVE JUROR: Okay.

THE COURT: You'll go back down to the jury assembly room for your next assignment.

PROSPECTIVE JUROR: Thank you.

THE COURT: Juror No. 42. Hi, good morning. Is there any question we've asked so far that you would answer yes to?

PROSPECTIVE JUROR: No.

THE COURT: All right, thank you for that.

Juror No. 10.

PROSPECTIVE JUROR: For question no. 32, I had a relative that was killed in a carjacking.

THE COURT: All right, so tell me about that. What -- when did this occur?

PROSPECTIVE JUROR: This was in the late nineties.

THE COURT: Okay. And it was a cousin or relative?

PROSPECTIVE JUROR: It's my cousin's father, like. It was not related to the father, but the wife. It's my aunt.

THE COURT: So it was the other side of the...

PROSPECTIVE JUROR: Right.

THE COURT: Family. Your, your relative is the wife.

PROSPECTIVE JUROR: Yeah.

THE COURT: Okay, and were you involved in any way in that or you just learned about it?

PROSPECTIVE JUROR: Oh, no, I wasn't involved, no.

THE COURT: Okay. Is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: I don't believe so, no.

THE COURT: All right. Thank you for that.

There was another couple of hands I saw. All right,

let's go to Juror No. 5. Boy, you are a lively group this morning.

PROSPECTIVE JUROR: About five years ago, my husband when he was in Sweden he was attacked, you know, there was no solution to it. The police didn't do anything at the time.

THE COURT: In Sweden?

PROSPECTIVE JUROR: Yes.

THE COURT: All right.

PROSPECTIVE JUROR: And I just --

THE COURT: Is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: Just that I still see -- I, I hope not, I would like it to not, but just -- there are definitely after-effects. He's nervous walking down the street, if someone's walking behind him, those kinds of things.

THE COURT: No, of course, he'll be --

PROSPECTIVE JUROR: Yeah, yes, but --

THE COURT: -- and you'll be concerned for him --

PROSPECTIVE JUROR: -- I would try my best not to let --

THE COURT: -- but that has nothing to do --

(Court reporter interrupts due to simultaneous conversation)

THE COURT: You gotta let me talk and then you can talk, yeah.

PROSPECTIVE JUROR: Sorry about that.

THE COURT: That has nothing to do with what's going to happen here in the courtroom about the evidence and the people in this case, right?

PROSPECTIVE JUROR: No.

THE COURT: Okay. So my hope is, you'll be able to tell me you'll be able to be fair and impartial.

PROSPECTIVE JUROR: Yep, I would absolutely do my best.

THE COURT: All right. Thank you for informing us.

Juror No. 8? No, in the front, Michael, to your left.

PROSPECTIVE JUROR: Sorry, your Honor. I was the victim of assault second, hit by a car. Someone knowingly fleeing the scene let me have it with the front end of their car.

THE COURT: All right. That's terrible.

PROSPECTIVE JUROR: Well --

THE COURT: I mean, is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: No. I, I just think, depending on circumstances, it may color things.

THE COURT: Okay. I appreciate your honesty.

Juror No. 14, who is it?

PROSPECTIVE JUROR: My best friend was murdered years ago in Prescott, Arizona.

THE COURT: I'm sorry, where?

PROSPECTIVE JUROR: Prescott, Arizona.

THE COURT: Okay. How long ago was that?

PROSPECTIVE JUROR: Very long ago.

THE COURT: Very long ago.

PROSPECTIVE JUROR: In the early nineties.

THE COURT: Okay. Of course that impacts you and that memory is always with you, but can you be fair and impartial here and give these parties --

PROSPECTIVE JUROR: I believe so.

THE COURT: Okay. Thank you.

All right, one more in the back, two more in the back. Juror No. 19.

PROSPECTIVE JUROR: As far as the crime, I just want to say my daughter was hit by a drunk driver while she was walking couple years ago, and I was -- in April, I had a check of mine stolen, washed, forged, and those are the two crimes, but I don't believe either one will impact my decision.

THE COURT: Thank you for that, Juror No. 19.

All right, the fellow behind you; yes. Just tell me your juror number, please.

PROSPECTIVE JUROR: Good morning, your Honor.

THE COURT: Good morning.

PROSPECTIVE JUROR: I'm Juror No. 25.

THE COURT: Twenty-five.

PROSPECTIVE JUROR: Yes.

THE COURT: All right.

PROSPECTIVE JUROR: So for question 30, I had my brother assaulted and attempted murder, and his case went on and then they dismissed it 'cause I guess there was no evidence or anything, but there was, and they let the criminal roam free, and he almost died.

THE COURT: All right, so I'm having a little trouble hearing you, so just speak up a little more, would you?

PROSPECTIVE JUROR: Sure.

THE COURT: So --

PROSPECTIVE JUROR: So my brother got assaulted with battery and attempted murder, hit him with a bat in the face. He was close to dying, but survived, but all his -- the charges of the criminal were, were wiped clean, they let him go, because apparently there was no case for that.

THE COURT: There was no what?

PROSPECTIVE JUROR: There was no case I guess, but there was not enough evidence for it.

THE COURT: Okay. Of course that's a terrible event for your family, but the question I have is, can you be fair and impartial here.

PROSPECTIVE JUROR: No.

THE COURT: The -- well, you're saying no, but, you know, a lot of people say, "no, I can't," but tell me why you

can't. Why is it that you can't be --

PROSPECTIVE JUROR: 'Cause there was no --

THE COURT: Hold on, you gotta let me talk. When I finish, you can talk, all right?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: That's how it works in my courtroom.

Tell me why it is you can't be fair and impartial here.

PROSPECTIVE JUROR: Because the criminal's still roaming free and I had no justice for my brother.

THE COURT: Well, I can easily understand that that criminal running free in your mind for whatever reason is no justice for your brother, but what does that have to do with what's going on here?

You don't know these people, you don't know what the case is about other than what I've indicated to you, so how can you get to the conclusion that, that you can't be fair and impartial here, tell me about it.

PROSPECTIVE JUROR: 'Cause I have already have, like, an open mindset that anything that happens, I would pretty much think they probably didn't do it or they did. Because even without the case I guess would it be? I would already assume he did it or she did it.

THE COURT: All right, Juror No. 25, you're excused, I'm going to send you back down for your next assignment to the

jury assembly room.

Juror No. 43. All right, you're now Juror No. 25.

Juror No. 43, good morning. Any of the questions I've asked so far you have a yes answer to?

PROSPECTIVE JUROR: No.

THE COURT: All right, thank you.

All right, we're up to 33, I guess. As you can tell, during the trial, you'll hear evidence concerning an alleged murder. Does the fact that the charges allege murder affect your ability to render a fair verdict?

Jamie Orsini and Nicholas Orsini are married to one another. Does the fact that the defendants are married to one another affect your ability to render a fair verdict?

Does the fact that the defendants are married affect your ability to consider the evidence against each defendant independently of the other?

The indictment charges that the victim of the alleged carjacking is Steven Kraft and that Steven Kraft was killed. You'll hear evidence that Steven Kraft is Jamie Orsini's ex-husband. Does the fact that Steven Kraft is Jamie Orsini's ex-husband affect your ability to render a fair verdict?

Each alleged crime is made up of distinct parts called elements. It is the Government's burden to prove beyond a reasonable doubt that the defendant you are considering committed each and every element of the crime charged. Do you

have any hesitation or unwillingness to follow this rule of law?

Should proof beyond a reasonable doubt be lacking as to any element, would you have any hesitation or unwillingness to follow the Court's instructions to vote not guilty because of the insufficient proof on that one element?

By contrast, should the evidence establish the elements beyond a reasonable doubt, would you have any problem or hesitation in following the Court's instructions to vote guilty?

The witnesses in this case will include law enforcement officers. Would you be more likely to believe a witness merely because he or she is an officer of any law enforcement agency?

Would you be less likely to believe a witness merely because he or she is an officer of a law enforcement agency?

Do you have any personal feelings or experiences concerning law enforcement officers that would prevent you from acting as a fair and impartial juror in this case other than what you've already told us?

Do you have any strong feelings about the criminal justice system that would prevent you from being a fair and impartial juror in this case? For example, do you have a strong belief that our legal system is too lenient or too harsh when it comes to persons charged with criminal offenses?

Do you have any impression or opinion or belief

concerning people accused of crimes, law enforcement, prosecutors, defense attorneys, or any other matter that would cause you to lean in favor of or lean against the defendants in this criminal case?

You may see or hear evidence in the form of video recordings, audio recordings, text messages, electronic mail, location information about electronic devices, or physical evidence found during searches. This evidence was lawfully obtained. Use of these procedures to gather evidence is lawful. Do you have anything feelings about the use of such evidence that would make it difficult for you to render a fair and impartial verdict?

To convict either of the defendants on any of the charges in this case, the Government must offer evidence that convinces you of that defendant's guilt beyond a reasonable doubt. I'll instruct you that the Government is not required to rely on or introduce any particular type of evidence. Do you have any hesitation or unwillingness to follow this instruction?

I'll instruct you that the Government is not required to use any particular investigating technique in presenting evidence of a crime. Do you have any hesitation or unwillingness to follow this instruction?

Each defendant is entitled to individual consideration, and the mere fact that a defendant has associated with others who may have engaged in criminal activity does not

make that defendant guilty. Do you have any hesitation or unwillingness to follow that instruction?

In our justice system, a defendant is presumed to be innocent and has no obligation to prove his or her innocence. Rather, the task of proving guilt beyond a reasonable doubt rests exclusively with the Government. Do you believe that a defendant charged with a crime is likely to be guilty or has an obligation to prove his innocence? Or her innocence.

In our justice system, a defendant is under no obligation to testify, and our constitution guarantees that the decision not to testify cannot be held against a defendant as the duty to prove guilt beyond a reasonable doubt, again, rests exclusively with the Government. Do you believe that if a defendant does not testify, it means he or she is guilty?

Will each of you accept the proposition that the question of punishment is for the Court alone to decide and that the question of possible punishment must not enter into your deliberations as to whether the defendants are guilty of the crime charged?

Will each of you accept the proposition of law that sympathy or empathy must not enter into the deliberations of the jurors as to whether the defendants are guilty and that only the evidence produced here in my courtroom may be used by you to determine whether the defendants are guilty or not guilty of the crimes charged?

Do you understand that Jamie Orsini or Nicholas Orsini have entered pleas of not guilty and that they are presumed to be innocent unless and until the Government proves them guilty beyond a reasonable doubt?

Do you have any religious, philosophical, or other beliefs that would make you unable to render a guilty verdict in this criminal case?

Do you have any reservations about discussing your opinions with other people or about sitting in judgment of others?

It may not be a particularly pleasant duty to find a person guilty of committing a crime. Do you feel that even if the crime establishes the defendant's guilt beyond a reasonable doubt that you might not be able to render a guilty verdict for reasons unrelated to the law and the evidence?

Until the case is over, each juror must avoid reading about this case in the newspaper or on the internet or social media and must avoid listening to any television, radio, or internet reports concerning the case should there be any. Each juror will be prohibited from discussing the case until the jury deliberates. Do you have any hesitation about your ability to follow these instructions?

I've tried to direct your attention through my questioning to any possible reasons that you might not be able to sit as a fair and impartial juror, but only you know whether

there is something else I did not mention that I should have asked about. I'm going to ask you to put yourselves in the position of the lawyers and the parties. If you were sitting in their position, is there any reason to be concerned that a juror like yourself could not be fair and impartial in this case?

Can you think of any other reason that you cannot or should not serve as a juror in this case?

All right, Juror No. 15.

PROSPECTIVE JUROR: Fifteen.

I just want to make note that I grew up with a father who was a sergeant in the New York City Police Department and my uncles also served as police officers.

THE COURT: All right. Are those facts going to impact on your ability to be fair and impartial here in this case?

PROSPECTIVE JUROR: No.

THE COURT: Okay, thank you, ma'am.

All right, we actually got through part 1. So now we'll go to part 2. And we'll start with...

MR. KOFFSKY: Your Honor, may we approach on some matters?

THE COURT: Okay.

MR. KOFFSKY: Thank you, your Honor.

(Discussion at sidebar:

THE COURT: Yes, Mr. Koffsky.

MR. KOFFSKY: I just wanted to put on the record challenges for cause that we would have.

THE COURT: We're not done yet.

MR. KOFFSKY: Well --

THE COURT: You're premature.

MR. KOFFSKY: Am I premature?

THE COURT: I think you are.

MR. KOFFSKY: I thought we would do it before we got to stage 2, but I leave that to the Court. I just wanted to --

THE COURT: What juror number do you find for cause?

MR. MOSKOWITZ: I would start with no. 1.

THE COURT: You got 1. You got 19?

MR. KOFFSKY: Yes, I have. Just let me go through it, your Honor.

MR. PATEL: There have been so many 19s, your Honor.

THE COURT: The current version.

MR. KOFFSKY: Nineteen.

THE COURT: One and 19.

MR. MOSKOWITZ: Right.

THE COURT: I mean, you guys got beaucoup peremptory challenges here.

How does the Government feel about 1 and 19?

MS. ARROYO: I think 1.

MR. MAIMIN: One we would have no objection to being off for cause. He's a racist and biased and I can't get over

that. I think that that's cause.

THE COURT: Yeah.

MR. MAIMIN: Number 19, he made a lot of comments that made clear he doesn't want to sit, but he hasn't said anything about his ability to be fair and impartial.

THE COURT: Right.

MR. KOFFSKY: But if I may, your Honor, when the Court asks him whether he can be fair and impartial and his response was "I guess not" --

THE COURT: Yeah.

MR. KOFFSKY: To me, that --

THE COURT: He's a wise guy.

MR. KOFFSKY: Yeah, not a sufficient answer.

MR. PATEL: My concern, your Honor, was, and I couldn't hear, but he said he suffered from some disease and had trouble sitting.

THE COURT: Yeah.

MR. PATEL: A physical ailment.

THE COURT: The osteoarthritis he said.

MR. PATEL: And...

THE COURT: All right, well, here's what I'll do, then. In deference to the early ask, at least one of you agree on Juror No. 1, I'll excuse him, I'll excuse 19 and we'll get two more in.

We're almost out of jurors, so we're running

dangerously close to the end of the panel. I had 50, which is usually more than enough. I'll excuse those two, we'll get the two in place, and then we'll start part 2, all right?

MR. KOFFSKY: Thank you, your Honor.

MR. YANNELLA: So 1 and 19.

THE COURT: You got no others, right? Those are the two. All right, I got it.)

(In open Court; jurors present)

THE COURT: All right, Juror No. 1, you're excused. Please report to the first floor jury assembly room, okay? For your next assignment.

Juror No. 43, come on up and sit in Juror No. 1's seat.

MR. MAIMIN: Forty-four, your Honor.

THE COURT: Oh, I'm sorry, 44. Forty-four, right? No, 43, he's 43.

THE DEPUTY CLERK: Yeah.

THE COURT: Hold on, hold on, Michael. Hold on.

Forty-three goes in Juror No. 1.

MS. ARROYO: No, your Honor.

THE DEPUTY CLERK: He was called already.

THE COURT: Oh, we called you already.

THE DEPUTY CLERK: He's 25.

THE COURT: I'm sorry, sit down, Juror No. 43, not 25. I'm screwing up the works here. Juror No. 44. I'm sorry. Just

give me a second to catch up. Forty-three is 25, 44 is 1.

All right, now, Juror No. 1, welcome.

PROSPECTIVE JUROR: Thank you.

THE COURT: Now that you've heard all the questions, are any of the questions that I've asked, would you have answered yes to any of those questions?

PROSPECTIVE JUROR: Only 2, having some family in a number of close friends in law enforcement.

THE COURT: Okay. Is the fact that you have family and friends in law enforcement going to impact on your ability to be fair and impartial for me here in this case?

PROSPECTIVE JUROR: It will not.

THE COURT: Thank you. Okay.

Juror No. 19, you're excused, you may go back down for your next jury assignment.

Junior 45, come on in Juror 19's seat.

Good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: You've heard all the questions that we've been asking. Are there any questions that if I had asked you, you would answer yes to?

PROSPECTIVE JUROR: Thirty-eight, 39, and 40.

THE COURT: All right. Well, why don't you tell me what's on your mind.

PROSPECTIVE JUROR: Well, it's my belief that law

enforcement in this country and within particularly this state, have a propensity to tell tall tales. For me, they're not just -- they're just not believable. I've had my own encounters with law enforcement for absolutely no reason, and I just don't believe in most cases or many cases that they are capable of telling the truth.

THE COURT: So you think that that predisposition is going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: It could be. It's possible.

THE COURT: All right. I'm going to excuse you. Juror No. 46 will replace you. Just hold on.

All right, good morning, ma'am.

PROSPECTIVE JUROR: Good morning.

THE COURT: You've heard all the questions. Are there any questions that if I had asked you, you would answer yes to?

PROSPECTIVE JUROR: Yes, your Honor.

THE COURT: What questions?

PROSPECTIVE JUROR: I have a couple, but mainly number 5.

I had an accident in which I hurt my back last year, and, unfortunately, this year as the new school started, I fell last Monday and I am in a lot of pain.

Again, after that, the other questions are, my son, my nephew, my brother are in the police enforcement, and I was a legal secretary and my cousins are lawyers.

THE COURT: Well, let's deal with it in two parts.

PROSPECTIVE JUROR: Sure.

THE COURT: Let's do the second half first.

PROSPECTIVE JUROR: Sure.

THE COURT: The fact that your family is involved in law, law enforcement, legal secretary, et cetera, is that going to impact on your ability to be fair and impartial here?

PROSPECTIVE JUROR: I do not believe so, your Honor.

THE COURT: Okay.

Now you're in pain.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Are you seeing the doc?

PROSPECTIVE JUROR: Yes, I am.

THE COURT: And has he given --

PROSPECTIVE JUROR: I actually have a --

THE COURT: -- you pain meds?

PROSPECTIVE JUROR: -- scheduled MRI now.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: I have a scheduled MRI.

THE COURT: All right, when is --

PROSPECTIVE JUROR: For next week.

THE COURT: -- that?

PROSPECTIVE JUROR: Next week.

THE COURT: Next week. And you're on pain meds now?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. I'm going to excuse you. You may report back to the first floor jury assembly room for your next assignment.

Juror No. 47. This could be a jinxed seat here. That's not jinxed.

All right, good morning, ma'am.

PROSPECTIVE JUROR: Good morning.

THE COURT: You know the drill.

PROSPECTIVE JUROR: I know the drill, and, no, there's no questions before that I would answer yes to that are pertinent to being able to be partial and fair.

THE COURT: Thank you very much.

PROSPECTIVE JUROR: Does that answer everything?

THE COURT: Yes, ma'am. Thank you.

All right, now we'll go to part 2.

So those of you that are old enough, you know, I'm not Johnny Carson, so I want to get you through these questions, so I'll start off with Juror No. 1 and somewhere along the line, grab the bull by the horns and just tell us what we need to hear from you as to your curriculum vitae, all right?

So we'll start Juror No. 1, tell us how old you are, where you were born, where you grew up, and where you reside.

PROSPECTIVE JUROR: I'm 52. I was born in White Plains. I grew up in Yorktown, in Westchester County. Right now, I live in Mahopac in Putnam County. I've been there for

twenty-plus years.

I have a master's as far as my degree. Right now I work for a Catholic school in northern New Jersey as their chief financial officer.

I have a wife who is a teacher in Bedford. I have two children. My daughter's 21 and my son is 17.

My father-in-law was in the navy, I believe, during Vietnam.

Newspapers, magazines is mostly CNBC, Blumberg.

What do I watch, *Billions* and *Suits*? So that's -- I watch those two.

And social media platforms, a little bit of Facebook, potentially.

And during my free time, I enjoy spending time outside, and we have a farm upstate.

THE COURT: Just tell me, does the older son or daughter, the 20- or 21-year-old, does he or she work?

PROSPECTIVE JUROR: No. She's a full-time college student.

THE COURT: Oh, terrific. Thank you for that.

Juror No. 2, off you go.

PROSPECTIVE JUROR: Okay, age 55, born in Manhattan grew up in Queens and Rockland. I live in Peekskill here in Westchester. I've been there since '02, so over 24 -- over 22 years. Uh...

THE COURT: How far did you go in school?

PROSPECTIVE JUROR: Yeah, I went in school, I got a Ph.D., I work at a land trust in Putnam County since 2014, so a little over ten years.

No other adults in the household. No kids.

No immediate family served in the armed forces.

I read *The New York Times*, *Associated Press*, *Axios*.

Radio stations, just kind of channel surf, and I really haven't watched TV in, like, the last 15 years or so. I used to watch *Law & Order*, but that was, like, back in the nineties.

No social media and free time, read, exercise, whatnot.

THE COURT: Thank you.

Juror No. 3, good morning.

PROSPECTIVE JUROR: Good morning.

I am 51, I was born in South Hampton, and I grew up on Long Island, out on the east end. Presently, I live in Staatsburg, up in Dutchess County. I've lived there for seven years, and previous to that, I lived in Hyde Park.

I have a master's degree. I am a teacher, high school teacher.

My husband is in the household. He is a PI, but he works for, like, insurance companies.

Do you have any children, yes, I do. I have three:

21, he's in college; I have a 20-year-old, she's in College; and I have a 16-year-old who is in high school.

My husband served in the Belgian armed forces, but I don't know if that counts.

Anything that I read that's newspaper magazines is science related. I like to listen to Audible like a junkie.

I used to watch *Law & Order* and *CSI* long time ago, but no longer.

I have Facebook and Instagram, but not much activity.

And I love to hike and walk my dog.

THE COURT: Thank you. Juror No. 4, good morning again.

PROSPECTIVE JUROR: Good morning.

I'm 70, I was born in Belfast, Maine, and I was an army brat or U.S. Air Force brat, so I moved all over the place, but I guess my teen years, I was in Evanston, Illinois. I currently live in White Plains where I've lived over 35 years.

Let's see, I have two master's degrees, I'm a retired English teacher, and I worked in Bronxville, New York.

My husband recently died. I told you all about what he used to do. I have two grown children, 30 and 36. The 36-year-old is a theater artist and the 30-year-old is a journalist, reporting on crypto.

My father was a chaplain in the U.S. Air Force.

I read *The New York Times*, *Washington Post*, CNN, NPR,

PBS.

I watch Rip Box sort of noir crime series.

I'm not on social media.

I read and I go to the theater, I like to garden.

THE COURT: All right, thank you for that.

Juror No. 5, good morning.

PROSPECTIVE JUROR: I'm 53 years old. I was born in Long Island and grew up in Long Island. I currently live in Westchester County, I've been there for thirty years. Let's see.

I have a master's degree, school psychologist. I've been doing that, you know, my whole career.

In the household, my husband is a retired teacher. I have two children, age 20 and 22. The 20-year-old is in college. The 22-year-old just finished graduate school and she's back home about to start her job. Let's see.

THE COURT: Where is she going to go to work?

PROSPECTIVE JUROR: Ernst & Young, accounting. Let's see.

No immediate family members have served in the armed forces.

I usually get my news from the television or, you know, online.

I don't watch *Law & Order*, *CSI*, or any police dramas.

I am on social media.

Free time, it's really just, you know, visiting my daughter at school, taking walks, things like that.

THE COURT: How often on social media and what social media are you on?

PROSPECTIVE JUROR: I do have Facebook, Twitter, and Instagram. Usually just scrolling through; I don't usually post very much.

THE COURT: Okay, thank you.

Juror No. 6, good morning.

PROSPECTIVE JUROR: Good morning.

I'm 69 years old. I was born in Incheon, just outside of Seoul, South Korea. I live in Scarsdale, Westchester, past twenty -- over 23 years.

And I went to medical school back in South Korea and I'm a laboratory physician, a clinical pathologist, since 1980s.

I live with my wife and she has been a homemaker her whole life. We have one grown-up daughter who is 36. She is an attorney, but she doesn't practice law, and she's an administrator at a law school.

And no family members in the army.

I read *New York Times* and *Wall Street Journal* on website, and I listen to traffic news while commuting, and watching no TV shows, no police dramas.

I don't do social media, and I like to visit museums, botanical garden and operas, and do some puzzles from *New York*

*Times.*

THE COURT: All right, thank you for that.

Juror No. 7, good morning.

PROSPECTIVE JUROR: Good morning.

I am 52 years old. I was born in Yonkers, New York, and grew up there. I currently live in Poughkeepsie for the last 24 years. Let's see.

I have a master's degree. I have currently work at a non-profit agency in Dutchess County, Mental Health For Children & Adults.

No adults in the household, no children.

My father was in the armed forces, army, Korea, 1952.

I read *The New York Times*, *Associated Press*, NPR.

Don't really watch a lot of television, just stream things on Netflix.

Don't like police dramas.

I'm on social media, Facebook, Instagram, and Twitter actively on Facebook. I also manage a community theater website and also their Facebook page, so pretty active on social media.

THE COURT: And your free time?

PROSPECTIVE JUROR: Community theater, going to Broadway shows.

THE COURT: Terrific.

Juror No. 8, good morning again.

PROSPECTIVE JUROR: I'm 60 years old. I was born in

Yonkers, New York. I live in Eastchester for the past 32 years.

I got some college. I dropped out third year. Retired police detective, Westchester County.

My wife cuts hair, she's still working. My oldest son teaches literature at old Miss -- my oldest son teaches literature at old Miss, my youngest is police officer NYPD.

My father served in the U.S. Army Air Corps during World War II, and during the Korea conflict, he was in the U.S. Air Force.

I generally do like a smattering of web sites. I'm all over the place, I don't have really one place for that.

I avoid police procedurals and pretty much do a lot of reading on, like, Twitter, Instagram.

And in free time, I just do reading.

THE COURT: All right, thank you for that.

Juror No. 9.

PROSPECTIVE JUROR: I am 41. I was born in Denver, Colorado. I grew up in Callicoon, New York. I still live there, so 38 years I've been in Callicoon.

I've got a four-year college degree. I work at Sullivan County BOCES as an assistant school business manager.

I -- my husband lives at home. He works for a local bus company. We have one daughter; she is five.

My father was in the army, Vietnam.

I pretty much read children's books, and, hmm, police

dramas would probably be *FBI* if I were to have watched.

I'm on Facebook, and in my free time, exercise and golf.

THE COURT: All right, thank you.

Juror No. 10, good morning.

PROSPECTIVE JUROR: I am 34 years old, I was born in Mount Kisco, currently live in Mahopac. I spent four years also in Newburgh where I attended Mount St. Mary College.

I currently hold my master's in education. I am a teacher in New York City. I teach history.

No other adults, no children, no family members in the armed forces. I do read the news, *New York Times* or whatever current news articles there are. It doesn't matter what website, I just read multiple sources.

I do watch *Law & Order* and somewhat other police dramas.

I am on Facebook, Twitter, Instagram, and TikTok.

And I like to play soccer, I coach soccer for my high school, high school team, and I like to read and listen to music.

THE COURT: Thank you.

Juror No. 11.

PROSPECTIVE JUROR: My age is 34 years old. I was born in Detroit, Michigan, grew up in Rockland County. I currently live in Nanuet, in Rockland, I've been there for the

past 12 years.

I have a bachelor's degree and I currently am a software engineer.

Other adults, my -- I live with my parents currently. They're both retired. Prior to that time, my father was also a software engineer. No children.

No family in the armed forces, occasionally listen to NPR, I don't watch *Law & Order* or any police dramas, no active social media, and free time, mostly just reading.

THE COURT: All right, thank you.

Juror No. 12.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning.

PROSPECTIVE JUROR: I'm 63 years old. I was born in the Bronx, New York. I grew up in the Bronx. I live in southeast Putnam County. I've been there for thirty years, same place.

How far did you go in school, I have multiple master's, both graduate degrees. I was a retired physical education teacher in the Westchester School District.

There are two adults in my house: my wife who still works at a physical therapist, and my daughter, my oldest daughter who's 30 years old, she's a K-through-6 kindergarten teacher.

I have two other children: my second daughter's 28

years old, she lives in California, she's a production manager in Hollywood; and my son is preparing to go into the police academy in Hawaii.

I have multiple members who have served in the military, in the army, the navy, brothers, nephews, my father.

I read *The Wall Street Journal*, sports magazines, and I follow any multiple articles that are online.

I did watch *Law & Order* in the past, I do watch *CSI* from time to time with my wife.

I am on Facebook and Instagram, and for my free time, I compete around the world in iron man triathlon events.

THE COURT: Good for you.

Thirteen. Good morning.

PROSPECTIVE JUROR: Good morning.

I'm 67 years old. I was born in Manhattan, but grew up in Williston Park on Long Island. I live in Millerton in Dutchess County. I've been there for 32 years.

I have a master's degree. I'm currently retired, but I worked in the information technology field at a private school.

I live with my husband who's retired. Before retirement, he was a high school history teacher.

I have two children: a 40-year-old daughter, who is a middle school teacher; I have a son who's 37 who owns a collision and corrosion repair shop.

I have a sister who served in the armed forces in the late seventies.

I primarily read *The New York Times* online. Magazines are usually just decorating web sites, decorating and health, don't really follow any blogs.

I literature to NPR primarily, I do not watch *Law & Order*, I really am on no social media platforms, and in free time, I like to read, walk, spend time with my grandchildren.

THE COURT: All right. Thank you for that.

Juror No. 14, good morning.

PROSPECTIVE JUROR: Good morning.

I am 61 years old. I was born in Brooklyn, lived there for 35 years. I now live in Fishkill in Dutchess County. We've been there since for 25, 26 years.

I have a bachelor's degree. I'm an accountant.

I have seven children. They range in age from 35 to 22. I have a civil engineer, a mechanical engineer, a refrigeration engineer, a chemist, a risk management, which is kind of actuary. My -- I live with my husband and my youngest daughter.

THE COURT: What does the husband do?

PROSPECTIVE JUROR: He's retired from the New York City Department of Education. He was a custodian engineer.

THE COURT: And what about your daughter who lives with you?

PROSPECTIVE JUROR: She just graduated, and she's working as a chemist in a skin care company.

THE COURT: Lot of smart kids.

PROSPECTIVE JUROR: Yep. They did okay.

I have watched *Law & Order*, *CSI*. We don't watch much of it now.

I'm on Facebook. I don't have a lot of free time, but I enjoy gardening and crocheting.

THE COURT: Anybody in the military?

PROSPECTIVE JUROR: No military.

THE COURT: All right, Juror No. 13, good morning.

PROSPECTIVE JUROR: Good morning.

I am 40 years old. I was born in Rockland County; that's where I grew up. I currently live in Yorktown. I've been there 11 years.

I have my master's degree. I am a second grade teacher.

I live with my husband who is a high school math teacher. I have two children, a 12-year-old and a 9-year-old.

I do not have any family in the arm forces.

I typically watch *News 12* and CNN. Yes, I've watched *Law & Order* and *CSI*.

I have Facebook, Twitter, and Instagram.

And my free time is spent driving my children around.

THE COURT: Ha, ha, ha. Don't wish that time away.

Sixteen, good morning.

PROSPECTIVE JUROR: Hello, good morning.

I am 47 years old. I was born in Bulgaria where I grew up. I came here in 2006, and since then, I've been in New York all the time. I live in Eastchester since 2014, so ten years.

MR. MOSKOWITZ: Judge, I'm sorry, I can't hear.

THE COURT: Can you just speak up a little, ma'am? So we can all hear you, please.

PROSPECTIVE JUROR: Sure.

I live in Eastchester since 2014. I have master's degree in accounting. I am an accountant. I have worked as an accountant always.

I live with my husband and two kids, eight years old and 12 years old.

THE COURT: What does the husband do?

PROSPECTIVE JUROR: He's in marketing.

No one served in the armed forces.

Newspapers, magazines, I read *New York Times*, I go online different web sites on cooking.

Radio and TV, not so much. I don't watch *Law & Order*.

Social media, yes, I'm on Facebook and Instagram, and I play tennis and I take care of my kids.

THE COURT: Do you work for a company in your accounting?

PROSPECTIVE JUROR: Yes.

THE COURT: What's the name of the company?

PROSPECTIVE JUROR: It's called Petkova & Pikoff. It's my husband and me.

THE COURT: Okay, thank you.

Juror No. 17. Good morning.

PROSPECTIVE JUROR: Good morning.

Hi, my name -- oh. Sharon Ottoberry. My age is 67. I was born in Birmingham, Alabama. We came to New York when I was 9.

I live in New Rochelle. I've been living there for the last eight years. Previous to that, it was Mount Vernon.

Two years in college, Wagner College. I worked as a correction officer for seven -- 35 years.

I do have -- live with my son, he's 32, and he work for an insurance company in Harrison.

No one served in the armed forces.

I listen to 1010 Win driving about. No particular radio station.

I do not watch *Law & Order* or *CSI*.

I'm not on any social media platform.

And I like to watch Bobby Flay, *Beat Bobby Flay*, all types of cooking shows, and in my free time, I try to cook like Bobby Flay.

THE COURT: Juror No. 20. Good morning.

PROSPECTIVE JUROR: Eighteen.

THE COURT: Oh, sorry.

PROSPECTIVE JUROR: Yeah.

THE COURT: Juror No. 18. I apologize.

PROSPECTIVE JUROR: Okay. I'm 49 years old. I was born and raised in Brooklyn, New York. I live right now in the town of Mamakating in Sullivan County. I've lived there for 22 years?

I have an MFA and an MAT, two master's degrees. I am a writer and also a high school special education English teacher. I've been doing that for seven years. I worked for the phone company before that. I had a change of career when my son died.

I live with my husband and my middle son. My husband owns -- we own our own landscaping company and my son works with him, that middle son. He's 25.

I have a 21-year-old in college right now, she's a senior, she's going for her degree in psychology. And I have a 27-year-old who is a freelance artist and designer, and he lives on his own in New York City. Children...

Oh, my uncles and my father all served on the armed forces, Army, Air Force, a bunch of them, a bunch of things.

I do not read the newspaper or watch the news or read magazines or blogs. I read for fun and excitement because I'm a writer.

I do watch *Law & Order* and *CSI* when I'm watching TV and *Criminal Minds* and all of those kinds of shows.

I am on all the platforms, but mostly for my writing. I have a Facebook account; I don't really ever go on there or Twitter. I do go on Instagram and TikTok because that's where I learn mostly about book prizes and contests for my writing and stuff like that.

In my free time, when I'm not reading or writing, I am knitting.

THE COURT: Thank you.

Juror No. 19, good morning.

PROSPECTIVE JUROR: Good morning.

My current age is 64, and I say current because in a few weeks, I'll be a little older. I was born in Tarrytown, New York, and I grew up in the Town of Ossining, and I've been a resident there for my life, so that should tell you.

I have two master's degrees, one in theology and one in psychology. I currently work covering as the executive director for a special -- as a -- for a school, a non-profit school, in Westchester. I have previously worked and retired from Westchester County after 35 years of service.

There are no other adults in my household.

I have one adopted son who is 34 and he currently works for a bus company -- a trucking company up in Connecticut.

I have multiple members of my family who have served

in the armed forces, beginning with my father who was in the army and then uncles who have served in the Marines and the army and the navy, as well as cousins and other family members.

No real newspaper, magazines, or web sites that I regularly tune into, nothing, nothing of any significance.

I don't watch *Law & Order* and *CSI* now, I'm more into *Matlock* and *Jessica Fletcher*, so that's what I'm watching.

Do I have -- I'm on the social media platforms of Facebook, Twitter, and Instagram, but I also have a master's degree in theology, so most of my things are on that end.

And most of my free time is knitting and crocheting or reading a book.

THE COURT: All right, Juror No. 20.

PROSPECTIVE JUROR: Hi. I am 58 years old. I was born and raised in India, emigrated to U.S. in 1995. I live in Yonkers for the last 23 years.

I have a master's degree in social work, and I work as a social supervisor in one of the city hospitals in the Bronx, and I live with my wife and one son.

I have three children: my daughter graduated, she works in Houston, Texas; my son has master's degree, he works as a care coordinator for the homeless population in the city; my daughter is in the school for nursing.

My nephew was in marine for the last forty years, he just retired from there, and my -- two of my cousins were in

army.

And I don't read any newspapers except when I go to work; I listen to the radio news 1010 or 880 and I don't watch any *Law & Order*.

I do have a Facebook account, but is no longer active, I don't go into that.

In my free time, I like to cook.

THE COURT: All right, thank you for that.

Juror No. 21.

PROSPECTIVE JUROR: Hello.

THE COURT: Hello.

PROSPECTIVE JUROR: I'll be 65 next week. I was born in Pittsburgh and raised in Plainfield, New Jersey. I currently lived for eight years in Yonkers. Prior to that, I raised my kids in Edgemont, which is part of the Town of Greenburgh.

I got a bachelor's in, what was it, sociology when I was young. I went back to school later and became a registered nurse, which I did for, I guess, 25 years, and then I went back to my previous work which was always in kitchens, though now I do it for volunteer work.

My husband's a cardiologist, still working. I have four grown children, they are 27 to 37: a Marriott director, a VP of an insurance company that handles the non -- big non-profits, a mechanical engineer, and one of them graduating from med school very shortly.

My dad served in the army during the Korean War.

I read *The New York Times* on my phone. *People Magazine* is my guilty pleasure when I'm getting my nails done.

Mostly, I watch the Yankees and listen to the Yankees on the radio if I'm not there. I'll watch whatever anybody else is watching. I like -- I also like the cooking shows.

I have a Facebook account somewhere in the cloud. I probably haven't seen it for twenty -- well, whenever it came out.

I like to garden, I have two puppies, I do a lot of walking and spend a lot of time in dog parks.

THE COURT: All right, thank you very much.

Juror No. 22, good morning.

PROSPECTIVE JUROR: Good morning.

I'm 41 years old. I was born in Newburgh, I grew up in part of Newburgh/Marlboro area. I currently reside in Pine Bush. I've been there for fifteen years.

I have a bachelor's degree in nursing. I work currently as a rapid-response nurse. Prior to that, it was an ER nurse.

I live with my husband who works for the highway department of the Town of Newburgh. I have three children: 12, 9, and 7.

I do not have any members of the armed forces.

I do not read any magazines or articles. If I see

something interesting when I'm scrolling through my Facebook feed, I'll read it, but nothing on a regular basis.

I don't particularly watch *Law & Order* and *CSI*, but I do watch, like, the ID Go police platforms.

I have a Facebook and I have a Instagram, but I mainly just scroll, I don't post.

And I have three kids, so I have no free time.

THE COURT: Heh, heh.

Anybody in the armed services, ma'am?

PROSPECTIVE JUROR: Nobody in the armed services.

THE COURT: Okay, thank you.

Juror No. 23, good morning.

PROSPECTIVE JUROR: Okay, good morning, Judge.

I am 39 years old. I was born in Massachusetts. I grew up in Poughkeepsie, New York. I currently live in Pleasant Valley, New York, in Dutchess County. I've been there for over ten years.

I have a bachelor's degree in civil engineering. I currently work as a structural engineer, bridge engineer.

I live with my husband who is also a structural engineer. I have two kids; they are three and one.

I -- my father-in-law served in Vietnam.

I don't regularly read anything in particular.

Cooking shows, listen to music.

I don't regularly watch TV. I don't watch police

dramas.

I am on Instagram, and that's it, and I mostly post pictures of my children for my family, and I also don't have -- just a mom right now, I guess.

THE COURT: All right, thank you for that.

Juror No. 24. Good morning.

PROSPECTIVE JUROR: I'm -- oh, I'm 27 years old. I was born in Yonkers and I grew up in Mount Vernon. I still live in Mount Vernon.

I'm currently getting my master's degree. I also work at a law school. I've been working as a fund-raiser for about six years now.

There are other adults in my household. I live with my fiancé, my parents, and my younger brother. My fiancé is a soccer coach and a teacher and my father is a soccer coach and electrician and my mother is not a soccer coach; she is a secretary at a Catholic school.

I don't have any children.

My fiancé's uncle was in the Air Force.

I do read *The New York Times*. I watch CNN. I watch every police drama there is.

I do have Facebook and Instagram. I mostly use it for my wedding photography business, and in my free time, I sleep or I hike upstate. My fiancé from Beacon, so we tend to just travel up there.

THE COURT: All right, thank you for that.

Juror No. 25.

PROSPECTIVE JUROR: Hello. I'm 67 years old. I was born and grew up in Rockland County. I live in Highland Mills in Orange County now. I've lived there for the last 40 years.

I am a college graduate. I'm a required teacher and coach. My wife is a retired nurse. I have two grown daughters: one is a high school teacher, the other is a physician.

I have no family members that were connected to the armed services.

I read a variety of news sources online, I subscribe to Apple News so I can see a variety.

I don't really watch too much TV. I don't care for crime dramas. I do like ABC News.

And in my free time, I like to do outdoor activities.

THE COURT: All right, thank you for that.

Juror No. 26.

PROSPECTIVE JUROR: I am 32 years old. I was born in White Plains, New York. I grew up in Edgemont, New York. I am currently living in Edgemont, New York for the past five years. Five years before that -- before that, I was in Manhattan, Boston, and New Jersey for work.

I have a bachelor's degree. I'm a copy writer.

I live with my husband and my father. I don't have children.

THE COURT: What do the husband and father do?

PROSPECTIVE JUROR: Oh, my husband is a sales manager in the natural foods industry, and my father is a retired psychologist, clinical psychologist.

No children.

No immediate family in the armed forces.

I read Apple News.

I do like shows like *Law & Order*, *Blue Bloods*, that kind of stuff.

I'm not on social media, and in my free time, I like to read and write.

THE COURT: Okay, thank you for that.

Juror No. 27.

PROSPECTIVE JUROR: Okay, I am 65 years old. I was born in West Germany, Bavaria, West Germany. Then I grew up in Eldred, New York. I live in Port Jervis, New York, Orange County. I've been at that residence for 17 years. And that -- yeah, between Port Jervis and Eldred, that's where I grew up.

I graduated high school. Then I have -- I had two years of college in Orange County Community College. Then after that, after the high school and the college, then I went to -- I did serve in the military, in the navy, for -- between '79 and '82. There's no -- oh, yeah, okay.

So for work, home health care. I've been doing that for 14 years. Before that, I worked in a school and I worked

with all different ages in the school and I still, I still work, I'm still employed.

There's no adults in my household. I have two children. One is 40, the other one is 42. My son is a baker and my daughter, she's into insurance, and like I said, I was -- I served in the armed forces.

I don't read newspapers or magazines; I don't go on blogs.

Radio stations, I do listen to them in the car.

Television shows, I do like comedies. I have watched *Law & Order* once in a while, I do watch that, but nothing more than that.

I'm not on any social media platform, and I like to read, watch TV, and do word game puzzles.

THE COURT: All right, thank you for that.

Juror No. 28.

PROSPECTIVE JUROR: Hello. I'm 64 years old. I was born and grew up in Trinidad, came to America in 1991, met my husband and got married right after. We lived in Yonkers, New York, since 1994.

I did not complete college.

My husband and I own a liquor store. Prior to that, I was a hairdresser in Manhattan.

We have one daughter, 24 years old. She's getting ready to start her master's.

No family members served in the forces.

I do read magazines sometimes.

I listen to the radio stations, no particular stations, and I watch television shows sometimes. *Law & Order*, *CSI* I do watch sometimes.

I'm not on social media platform, Facebook or Twitter.

In my spare time, I like to work in my garden.

Thank you.

THE COURT: Thank you.

Juror No. 29.

PROSPECTIVE JUROR: I'm 51 years old. I was born in New Rochelle, New York, grew up in Scarsdale, New York. I live in Rye Brook. I've been there for 25 years.

I have a bachelor's degree in business. I'm an executive recruiter. I've been doing it for about 14 years.

I live with my husband; he's a TV producer. We have five children: my twenty-year-old is a teacher, my 25-year-old worked in finance, my 21-year-old is in college, and my twins, who are 19, are also in college.

None of my family members have been in the armed forces.

I read *The Times* and *The Post*, like to watch ABC news. I don't watch *Law & Order* or *CSI*.

I am on Facebook and Instagram regularly.

In my free time, I like to play tennis and exercise.

THE COURT: All right, thank you for that.

Juror No. 30.

PROSPECTIVE JUROR: Can I skip?

THE COURT: Can we skip?

PROSPECTIVE JUROR: Yeah.

THE COURT: No, heh.

PROSPECTIVE JUROR: I was reaching.

Fifty-nine, Orange County, New York, presently in the Greenville, area. I've been there for 25, 30 years.

Attended some college, did a nursing...learning. I work with handicapped at this point in a group home.

My husband works for the County, plowing snow in the wintertime so y'all can get into work. I have four kids. A son-in-law that's in the navy and a son that was honorably discharged from the army.

I don't watch -- I like to watch the ID channels.

Once in a while on Facebook, no big deal.

And work in my free time, I work on my free time, I have no free time, it's constantly overtime, overtime, overtime.

THE COURT: All right, thank you for that.

Juror No. 31.

Forty-seven years old, born in Hudson, New York, Columbia County, grew up in a town, a neighboring town. I live now in the Middletown area, in Orange County. I've been there -- I've been in my house for three years. Before that, I was in

Middletown and Warwick, all in Orange County.

I completed my associate's degree, went back for several attempts at my bachelor's, but did not finish. I'm a union iron worker for about the last ten years. Before that, various things, all construction-related.

There are other adults in my household. My wife is a professor, SUNY Orange. My mother works part time at the school where my children attend. I have two children, both daughters, 17 and 11. Neither one work. Well, my oldest works part time and goes to school.

My father was in the navy during Vietnam.

I do not read any newspapers, magazines.

Mainly listen to contemporary Christian music on the radio.

I used to watch *Law & Order*, but I no longer, no longer do.

I have no social media anymore.

And free time I have I usually spend, you know, ferrying my kids back and forth and fixing things around the house.

THE COURT: Okay, thank you for that.

Juror No. 32.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: Good afternoon.

PROSPECTIVE JUROR: I'm 63 years old. I was born in

India, and I live there twenty-some years. I moved to Bronx, I live there twenty-some years. Now, currently, I live in Rockland County for twenty-some years.

And, you know, I did my -- when I came to this country, I was a computer hardware tech and I achieved a associate degree in radiology, and I work in St. John's Hospital, Nyack Hospital last 32 years. And what else...

And I'm married, I'm married, my wife is a nurse and I have three children. The elder one is a pharmacologist, he's doing research and development in a pharmacy, and two others still in college, in the medical field.

I don't have anybody in the military.

And I like to watch the Channel 12 and the CNBC, that's my channels. Nothing else I don't watch.

I don't have any social media.

And in my free time, I jog, I run, I bicycle, I fix my car, fix things around, lawnmower, computer, anything. That's all I do.

THE COURT: All right, thank you for that.

Juror No. 33.

PROSPECTIVE JUROR: Hello.

THE COURT: Hello.

PROSPECTIVE JUROR: I am 52 years old. I was born in St. Lewis, Missouri. I grew up in Lagos, Nigeria. I came back to the states after I finished high school. I live in Rockland

County. I have been living there since.

I have two master's degrees. I'm a microbiologist and a Christian life coach.

I have two, two daughters in my household: one is 22, one is 19. The 22-year-old just graduated from college and she is an art therapist, and the younger one is in college.

I work for Westchester County government, in the public health lab.

I have a brother that's in the armed services. He's actually in the army.

I don't listen to the news. I do read sometimes through Apple.

I don't listen to the radio.

I binge, I binge audible books.

I do not watch *Law & Order* or *CSI* or any of those other things.

I do have social media. I am on Instagram and TikTok.

In my free time, I love walking and exploring New York City.

THE COURT: All right, thank you for that, ma'am.

Juror No. 34.

PROSPECTIVE JUROR: Hi. I am 36 years old. I was born and raised in northern New Jersey. Now I live in Le Grange in Dutchess County. I've been there for about eight years. Before that, northern New Jersey and New York City.

I've got two bachelor's degrees. I'm a hospice nurse.

I have a husband; he owns a small business doing product design and development. I do have two children: they are seven and four and a half. She'd be upset if I didn't give her that.

And no immediate family in the armed forces.

I tend to avoid the news; it gives me anxiety. Used to be more of a -- when I did watch the news, it was more NPR, *New York Times*, or stuff.

I listen to a lot of audio books.

Don't watch a lot of other -- or don't watch a lot of television shows, no *Law & Order*, no *CSI*.

I have Facebook; it's currently deactivated. I do have an Instagram.

And in my free time, I like to paint and read books and hang out with my kids outside.

THE COURT: All right, thank you for that, ma'am.

Juror No. 35.

PROSPECTIVE JUROR: Good morning, or good afternoon.

I am 60 years old, I was born in Manhattan, I was raised on Long Island, but I've lived in Chappaqua, New York, for the last thirty-plus years.

I have a master's degree. I am a teacher, as I said. I teach visual literacy to third graders at a film center.

My husband lives with me. He is a retired arbitrage

trader from a hedge fund.

I have three children: 28-year-old twin daughters, one is a creative designer at Accenture, one is a data analytic at an online merchandisers; and a 25-year-old son who is an investigative analyst at the Manhattan DA in the Rackets Bureau.

My dad was in the Air Force a very long time ago, as a physician.

I read *The New York Times*, I read *The New Yorker*.

I watch a lot of news, Fox News, NBC News, ABC News, reality TV, any kind of TV. I've seen every *Law & Order SVU* because my daughters were addicted to it growing up, so I pretty much know those back and forth.

I am on Instagram and TikTok mainly to see what my kids are doing, and in my free time I like to read, travel, and exercise.

THE COURT: All right.

Juror No. 36, good morning.

PROSPECTIVE JUROR: Good morning.

I'm 55 years old, grow up in Somers, New York. I currently live in Carmel, New York, Putnam County, been there for 25 years. Let's see...

I went to high school, graduated high school, didn't go to college. Right now, I work for Metro-North Railroad, been there for 18 years, work for the mechanical department, shop foreman there.

Adults in the household, my wife is the school nurse at the local high school. My children, my daughter is a senior in that high school and my son is a senior in college.

My father served, he was in the Marines during Korea.

Newspapers, magazines...no newspapers, magazines, really.

TV it's kind of like CNBC, Fox News a little bit.

No *CSI*.

I do have a Twitter account, very minimal stuff going on there.

Free time, I kind of like fishing, skiing, that type of stuff.

THE COURT: All right, thank you for that.

All right, may I see the lawyers at the sidebar, please.

(Discussion at sidebar:

THE COURT: All right, counsel, are there any for-causes you'd like me to consider?

MR. MAIMIN: No, your Honor.

THE COURT: Defendant.

MR. YANNELLA: Judge, I have a juror that I would ask you to inquire of further. It's no. 24, Kenny? Kenny lived in Beacon and any resident of Beacon in 2020 probably heard about this case. There was very active posting on social media.

THE COURT: Juror No. 24?

MR. YANNELLA: Yes. He was very active posting on social media.

THE COURT: I got it.

MR. YANNELLA: Okay, thank you, your Honor.

THE COURT: Anything else?

MR. PATEL: Just one second, your Honor.

Juror No. 17 mentioned that she has an overactive bladder problem.

THE COURT: Yeah.

MR. PATEL: If your Honor inquires whether that would affect her ability to concentrate or whether that would be a distraction for her.

THE COURT: I thought I did that. I don't want to embarrass her. I mean, you got a peremptory if you're unhappy. I think she said she wants to and she's okay. She got up once in two and a half hours, which is fine, because we'll take breaks every so often.

MR. MAIMIN: And also she says she's on medication.

THE COURT: She's on meds. All right, I don't want to embarrass her. That's all.

Anything else besides Juror No. 24? I'll ask that question. Is there anything else from defendants? I'll take that as a no.

MS. ARROYO: Your Honor, if you could clarify, I think the Juror No. 24 said that her fiancé lives in Beacon, not that

she lived in Beacon and so -- yeah.

THE COURT: We'll clarify.

All right, other question, are you satisfied with the jury selection process so far.

MS. ARROYO: Yes.

MR. MAIMIN: Yes, your Honor.

THE COURT: Defendants. Gotta say something. Gotta weigh in.

MR. PATEL: Could we have a moment, your Honor?

THE COURT: Huh?

MR. PATEL: Can we just have a moment? I don't want to --

THE COURT: Sure. It's not a loaded question. What do you want to do? Hold on.

MR. PATEL: Just want to consult --

MR. YANNELLA: Consult with my colleagues.

THE COURT: Oh, okay.

(Discussion off the record)

THE COURT: All right, counsel?

MR. PATEL: We're satisfied, your Honor.

THE COURT: Thank you. All right, we'll go back.

MS. ARROYO: I didn't hear what you said.

MS. WHEELOCK: They're satisfied.

MS. ARROYO: Oh, great.

MR. KOFFSKY: So far.)

(In open Court; jurors present)

THE COURT: Juror No. 24, just a follow-up question.

Raise your hand, Juror No. 24, so we get you, yeah, just a follow-up.

Was it you or your fiancé that lived in Beacon?

PROSPECTIVE JUROR: My fiancé. He grew up there.

THE COURT: He grew up there.

PROSPECTIVE JUROR: Yeah.

THE COURT: And neither you nor he is currently living there, right?

PROSPECTIVE JUROR: No, but we plan on moving there.

THE COURT: Okay. It's a nice town.

PROSPECTIVE JUROR: Yeah.

THE COURT: But when he was living there -- when did he leave there, in other words?

PROSPECTIVE JUROR: Last year. His whole family still lives there, his fathers, everybody.

THE COURT: Right. Right. Did he ever talk to you about anything related to this case or being aware that this case existed in the town of Beacon?

PROSPECTIVE JUROR: No.

THE COURT: Have you ever heard of this case before today?

PROSPECTIVE JUROR: No.

THE COURT: All right, thank you for that.

All right, here's what we're going to do. We've worked very hard. I appreciate all your cooperation. The jurors who have not been selected, you'll go back down to the jury assembly room, please, and Mr. Frankel, Pratik, you'll go back and get the questionnaires. We don't want anybody taking our questionnaires with them. So we'll collect the questionnaires. You may go back down to the jury assembly room with the thanks of the Court for your next assignment, and the rests of you -- so you guys can leave now. We'll get you on your way. There's only a couple of you left. All right, thank you very much.

The rest of you, we're going to take about a -- I'm going to say 15-minutes-or-so break. You'll be in the hallway, use the restrooms, don't go anywhere, don't leave the floor. I'll have some work to do with the lawyers and then we'll have you back in in a few minutes, okay? So you'll take a break right now, hand up your questionnaires, just pass them along, and we'll get you back in here. I'm saying 15 minutes or so, all right?

Thank you.

(In open Court; jurors not present)

THE COURT: I just have to wait for my courtroom deputy. Are we prepared to go forward with peremptories? Are we ready to go?

MR. MOSKOWITZ: Judge, we need -- since we are trying

to exercise them jointly, we need a few minutes to consult.

THE COURT: I can give you a few minutes.

MR. PATEL: Thank you.

MR. MOSKOWITZ: Okay.

THE COURT: I'm going to sit here and wait for your few minutes to go talk.

MR. MOSKOWITZ: May we go over here?

THE COURT: Yeah, of course.

(Discussion off the record)

MR. MAIMIN: Your Honor...

THE COURT: They're outside the room. What is it?

MR. MAIMIN: I'm going to ask a dumb question, and it may have been gone over at the conference that I missed, but I know judge structurally does the peremptories a little bit different in terms of whether it's simultaneous, how many on the first round, et cetera.

Could I ask you for a reminder how --

THE COURT: Yes.

MR. MAIMIN: -- your Honor likes to do it.

THE COURT: Sure. We're going to do four rounds of two and one, defendant will go first, and two rounds of one and one.

MR. MAIMIN: Okay. Thank you.

THE COURT: And then we'll go to the alternates once we agree that the jury is selected and you'll get two each.

MR. MAIMIN: Thank you.

THE COURT: Why don't we take a brief recess until 1:05, because they're still in there talking, so...

THE DEPUTY CLERK: All rise. Court is in recess.

(Recess taken)

THE DEPUTY CLERK: All rise.

THE COURT: All right, counsel, be seated.

We'll do for you rounds of 2 for the defendant, one for the Government, and two rounds of 1 each for the Government and the defendant. The defendant goes first.

First two.

MR. MOSKOWITZ: Judge, Jurors No. 4 and 8. Mary Schenck and James Ross.

THE COURT: Got it, 4 and 8.

Government?

MR. MAIMIN: 10, your Honor.

THE COURT: All right, Government. Second round, you go first.

MR. MAIMIN: Oh, we go first, I'm sorry.

2, please, your Honor.

THE COURT: All right.

Defendants?

MR. MOSKOWITZ: One moment, Judge.

Jurors no. 12 and 13.

THE COURT: All right, Defendant, round 3. Which two?

MR. MOSKOWITZ: Jurors No. 16 and 17, Judge.

THE COURT: Government.

MR. MAIMIN: 18, your Honor.

THE COURT: All right.

Round 4, Government first.

MR. MAIMIN: 26, your Honor.

THE COURT: Defendant.

MR. MOSKOWITZ: Just one moment, Judge.

29, Judge, and 31.

THE COURT: All right, now we'll go to round 5, which is one each, Defendant first.

MR. MOSKOWITZ: 35, Judge.

THE COURT: Government.

MR. MAIMIN: 30, your Honor.

THE COURT: All right.

Round 6, Government first.

MR. MAIMIN: 35, your Honor.

THE COURT: 35's already gone.

MR. MAIMIN: Oh, you took 35, okay.

We have no more strikes, your Honor.

THE COURT: All right.

Defendant.

MR. MOSKOWITZ: Just one moment, Judge.

(Extended pause)

MR. MOSKOWITZ: Judge, number 22.

THE COURT: Okay. You have the juror list in front of you, right? And you have the random column and the names, so I'm going to read to you the first 12, which are our jurors. We'll confirm that with each of you, and then we'll go to the alternates, okay?

MR. MOSKOWITZ: Yes.

THE COURT: Juror No. 1 is Scott Hirschmugl;

Juror No. 2 is No. 3, Donna Franzik;

Juror No. 3 is Juror No. 5, Christine Valvolizza;

Juror No. 4 is No. 6, Sung Choo;

Juror No. 5 is No. 7, Joseph Pettignano;

Juror No. 6 is Juror No. 9, Tara Ditommaso;

Juror No. 7 is Juror No. 11, Samuel Hu;

Juror No. 8 is Juror No. 14, Anne Lavalle;

Juror No. 9 is Juror No. 15, Valerie Meltz;

Juror No. 10 is that hot seat Juror No. 19, Marlene Cheatham;

Juror No. 11 is Juror No. 20, Kuriako Chacko; and

Juror No. 12 is Juror No. 21, Meryl Moser.

That's our jury of twelve.

Just confirm for me each side that you agree.

Government?

MS. ARROYO: Who is Juror No. 6, your Honor? I'm sorry.

THE COURT: Juror No. 6 is Tara Ditommaso. She

replaced Juror No. 40. Or 41.

MR. MAIMIN: We agree, your Honor.

MS. ARROYO: Yes.

THE COURT: All right, Defendants?

MR. MOSKOWITZ: We agree, Judge.

THE COURT: All right.

Now we'll go to the alternates. You'll each have -- we have two rounds and however it shakes out, the first four will be our alternates, right?

So, Government?

MR. MAIMIN: No strike, your Honor.

THE COURT: Defendant.

(Extended pause)

MR. MOSKOWITZ: Judge, nos. 24 and 27.

THE COURT: 24 from round 1, and then you'll begin round 2, you'll have 27.

Government.

MR. MAIMIN: No strikes, your Honor.

THE COURT: All right, so the 4 alternates will be:

Juror No. 23, Yvonne Choubah;

Juror No. 25 will be alternate 2, that's George Glover;

Alternate No. 3 is Juror No. 28, Sandra Samnarine; and

Alternate Juror No. 4 will be Juror No. 32, Paul Parambi.

I need confirmation that those are our four alternates.

MR. MAIMIN: Yes, your Honor.

MR. MOSKOWITZ: Yes, your Honor.

THE COURT: All right, let's bring the panel back in.

Just before we do, just give me one second with the lawyers.

We're going to stop at 3:15. They haven't lunch so I was thinking we could stop at 2:15, send 'em home for the day and I'll give them preliminary instructions. Unless you think you could both sides do your openings by 2:15. I doubt that's possible.

Is it?

MR. PATEL: I think your Honor is correct.

MR. MAIMIN: Ours is about a 20-minute opening, your Honor.

THE COURT: Roughly on the Defendants' side?

MR. YANNELLA: Five to seven minutes.

MR. PATEL: I'll be quick, your Honor.

THE COURT: All right, maybe we can, let's see how we do.

Let's bring the panel back in and off we go.

MR. KOFFSKY: Your Honor, I haven't had a break; may I have two minutes in the men's room?

THE COURT: Go ahead. You don't mind if we start

without you, though, right?

MR. KOFFSKY: Yes, yes. Much better without me.

THE COURT: I don't know about that, Mr. Koffsky.

Bring them in. Mr. Koffsky said we didn't need him.

(In open court; Jurors present)

THE COURT: All right, ladies and gentlemen, please be seated.

We'll now have Mr. Frankel read the names of the 12 jurors, and then we'll take a breath and make sure we're all in agreement and then we'll go to the alternates.

THE DEPUTY CLERK: So Juror No. 1 is Scott Hirschmugl;

Juror No. 2 is Donna Franzik;

Juror No. 3 is Christine Valvolizza;

Juror No. 4 is Sung Choo;

Juror No. 5 is Joseph Pettignano;

Juror No. 6 is Tara Ditommaso;

Juror No. 7 is Samuel Hu;

Juror No. 8 is Anne Lavalle;

Juror No. 9 is Valerie Meltz;

Juror No. 10 is Marlene Cheatham;

Juror No. 11 is Kuriako Chacko; and

Juror No. 12 is Meryl Moser.

THE COURT: Before we go any further, are counsel in agreement? Government?

MR. MAIMIN: Yes, your Honor.

THE COURT: Defense.

MR. MOSKOWITZ: Yes, your Honor.

THE COURT: All right, now we'll read the names of the Alternate Jurors.

THE DEPUTY CLERK: The first alternate is Yvonne Choubah;

The second alternate is George Glover;

The third alternate is Sandra Samnarine; and

The fourth alternate is Paul Parambi.

THE COURT: All right, ladies and gentlemen, if your name has not been called, I thank you for being here this morning. Please return to the jury room on the first floor for further instructions. I very much appreciate your attention and the time you spent with us this morning.

So we'll first let you depart.

(Remaining jurors excused)

THE COURT: Everybody back to the jury assembly room.

All right, now, Mr. Frankel, you'll seat the jury in their seats, and these will be the seats you'll be sitting in for the duration, all right?

(Jurors seated)

THE COURT: All right, ladies and gentlemen, let me say a few words to you about the alternate jurors first.

Ultimately, only twelve jurors deliberate on a verdict. However, alternate jurors may be, and often, called

upon to replace a member of the main jury if for any reason one of the first twelve can no longer perform his or her duties, so all 16 of you must pay strict attention to the facts and the instructions of law. I can't stress that enough. The four alternates are jurors in every sense of the word and will function as part of the jury unless and until you are excused from the jury.

All right, Mr. Frankel, let's swear in our jury, please.

THE DEPUTY CLERK: Can everyone please stand and raise your right hand.

You and each of you do solemnly swear or affirm that you are able well and truly try this issue now on trial and a true verdict give according to the law and the evidence, so help you God.

ALL: We do.

THE DEPUTY CLERK: Thank you, please be seated.