UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
UNITED STATES OF AMERICA,

23 CR 402 (PMH)

-vs-

JURY TRIAL

JAMIE ORSINI and NICHOLAS ORSINI,

Defendant(s).
--------------------------------------x

United States Courthouse
White Plains, New York

Tuesday, September 17, 2024

Before: THE HONORABLE PHILIP M. HALPERN,
District Judge

A P P E A R A N C E S:

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
MICHAEL MAIMIN,
KAIYA ARROYO,
Assistant United States Attorneys

AVRAHAM MOSKOWITZ
DONALD YANNELLA,
Attorneys for Defendant Jamie Orsini

KOFFSKY & FELSEN
Attorneys for Defendant Nicholas Orsini
BY: BRUCE KOFFSKY

ANDREW G. PATEL,
Attorney for Defendant Nicholas Orsini

THE DEPUTY CLERK: All rise.

THE COURT: All right, from this point on, until you retire to deliberate for your verdict, it's your duty not to discuss this case and not to remain in the presence of others who are discussing the case. The rule about not discussing this case with others includes discussions even with your own family members or your friends. If at any time during the course of the trial, any person attempts to talk to you or communicate with you about the case, either in or out of the courthouse, you should immediately report such an attempt to me through my deputy, Mr. Frankel.

In this regard, let me explain to you that the parties in the case are not supposed to talk to the jurors, not even to offer a friendly greeting, so if you happen to see one of the attorneys or anyone else from the Government's table or the defendants' table outside of this courtroom, they will, and they must, ignore you. Please don't take any offense to that; they're just acting properly by doing so.

I know that many of you use cell phones, the internet, social media, and other tools. You must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cellphone, through email, iPhone, text messaging, or on social media platforms, including blogs, web sites, chat rooms,

or Twitter, Facebook, LinkedIn, or YouTube.

I'll now give you some instructions, preliminary, and then we'll hear from the lawyers, and then we'll be discharging you early today. I figured you'd be happier with me if I said we'd get through a little bit more and you go home before 3:15 rather than give you an hour and come back for 45 minutes. If you want to, take off your masks. You're free to take off your masks now; you don't need them anymore.

Ladies and gentlemen, you are now my jury. There is no higher function in our legal system. From now on, whenever you enter or leave the courtroom as a jury, the parties and I and the audience will stand the same as they do for me because you're every bit as important as a trial judge.

Let me introduce or re-introduce some of the people who are here.

As I told you before, my name is Philip Halpern.

You've already met the defendants and their attorneys and the prosecution team.

Mr. Frankel, seated in front of me, to my right, is my courtroom deputy. He's the person you'll interface with during the trial. Any questions, any difficulties, he's your concierge service in the Southern District. He's terrific; he'll address any of your needs.

Pratik Ghosh, who is sitting to my left, is one of my law clerks, and he is here to help me with any legal issues that

the lawyers raise where I need some research done.

Tabitha's our court reporter, and, frankly, she's one of the best in the fleet. She'll take down everything that's said at trial in a verbatim record so that later, if you want testimony re-read to you during your deliberations, we'll be able to do it.

In the American system of justice, the judge and the jury have separate roles. My job is to instruct you as to the law that governs this case. I'll give you some instructions now and others from time to time during the trial. At the end of the trial, I'll give you detailed instructions about the law you will need to apply when you deliberate. Your job as jurors is to determine the facts based on the evidence presented at trial. You are the only triers of fact, and your decisions on the factual issues will determine the outcome of the case.

You must not take anything I may say or do during the trial as indicating what my opinion is or what your verdict should be. It's not my job to even have such an opinion, and if I did, it must not influence you in any way. You must pay close attention to all the evidence presented. Evidence consists of the sworn statement of witnesses and the exhibits that are admitted into evidence or stipulations agreed to by the attorneys. A stipulation is simply an agreement between the lawyers about facts or testimony.

Certain things are not evidence in this case and you

must not consider them as evidence.

For example, nothing I say is evidence. Statements and arguments by the lawyers, that is not evidence either. They are simply arguments in which the lawyers tell you what they think the evidence proves and how they think you should analyze the evidence. You should give these statements and arguments weight only to the extent they appeal to your own common sense and you should under no circumstances consider them evidence.

Questions asked by the lawyers are not evidence. Only the answers given by the witness are evidence. For example, if a witness is asked "it was raining that day, wasn't it," and the answer the witness gives is "no, it wasn't," then based on that question and answer, there's no evidence in the case that it was raining that day, no matter how convinced the lawyer sounded when he or she asked that question. Of course, you don't have to accept a witness's answer at face value. One of the most important things you'll do is assess the credibility of the witnesses, which I'll talk to you about in a moment.

Objections to questions are not evidence. The lawyers are obligated to make an objection when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question and any answer that may have been given. If it's overruled, treat it like any other question and answer.

Any testimony that I exclude or strike or tell you to disregard is not evidence and you must not consider it. If I instruct you that some evidence is only to be considered for a certain purpose, you must follow that instruction.

Finally, anything you see or hear outside of this courtroom is not evidence and should be disregarded by you. You are to decide this case only on the evidence presented here in the courtroom.

In deciding the facts of the case, you'll have to decide the credibility of witnesses, that is, how truthful and believable they are.

How do you decide what to believe and what not to believe? You're going to listen to the witnesses, observe them, and then decide just as you would decide such questions in your everyday, ordinary life. Ask yourselves: did they know what they were talking about? Did they appear to be honest, open, and truthful? Did they have a reason to falsify, exaggerate, or distort their testimony? Is there any reason to think they might be mistaken about what they're telling you? What was their demeanor or manner when testifying? How did their testimony square with the other evidence in the case? In other words, is there other evidence that supports their testimony or undermines it? Considering these sorts of issues will help you determine what testimony to accept and what testimony to reject.

Now, as the trial proceeds, you may have impressions

of a witness or a subject, but you must not allow these impressions to become fixed or hardened, because if you do, in a sense, you foreclose consideration the testimony of other witnesses or other evidence that may be presented after the witness you heard. This would be unfair to one side or the other. A case can only be presented step by step, witness by witness, until all of the evidence is before you.

You know from your own experiences that frequently, you'll hear a person give a version of his or her view of an event which sounds most impressive, and even compelling, and yet, when you hear another person's version of the same event or the same person questioned further about it, what seemed quite compelling and impressive may be completely dissipated or weakened. Likewise, if someone describes something and it doesn't make much of an impression, but later evidence supports what the witness said, what didn't seem particularly compelling when you first heard it may be considerably stronger.

So remember, there may be another side to any witness's story and there may be more to come on any issue. You must, therefore, keep an open mind until the trial is over and not reach any conclusions until you have all of the evidence before you.

Also, remember that you promised to be a fair juror. A fair juror is a person who will keep the promise to be fair and impartial and will not base the decision in this case upon a

bias or prejudice in favor of or against a person who may appear in this trial on account of that person's race, color, national origin, ancestry, gender, gender identity or expression, religion, religious practice, age, disability, or sexual orientation.

A fair juror must be mindful of any stereotypes or attitudes about people or about groups of people that the juror may have, including implicit biases. Unconscious or implicit biases are stereotypes, attitudes, or preferences that we express without conscious awareness, control, or intention. Like a conscious bias, unconscious and implicit bias, too, can affect how we evaluate information and make decisions.

A fair juror must not allow these stereotypes or attitudes to affect their decision. You can do this by asking yourself whether your views and conclusions would be different if the parties, witnesses, or others that you have heard about or seen in court were of a different race, color, national origin, ancestry, gender, gender identity or expression, religious practice, age, or sexual orientation or did not have a disability. If the answer's yes, then in keeping with your promise to be fair, reconsider your views and make sure your decision is based on the evidence and not on stereotypes or attitudes. Justice requires no less.

To ensure that you decide this case only on the evidence and that you not be influenced in any way by anything

that might occur outside the courtroom, I must give you a specific set of instructions now.

First, do not discuss this case, please, with anyone while it's going on. That includes members of your own family, close friends, co-workers. You may tell your family and friends and employer that you're a juror in a case and how long you expect it to last, but don't tell them anything else about the case until after you've been discharged by me. Not discussing the case includes not blogging, tweeting, using Facebook, Instagram, TikTok, or the like. Until you're discharged, you can't say anything by any means or in any forum other than that you are on a jury. I can't emphasize strongly enough how important it is you not discuss the case in person, by social media, or otherwise until the case is over.

That instruction probably doesn't surprise you, but what may be a little bit surprising to you is that you may not discuss the case even amongst yourselves while the trial is ongoing. You'll have the opportunity, and, indeed, it's your duty, to discuss the case amongst yourselves later on, but that can only happen after all the evidence is in and the case is given to you to discuss and decide in the jury room.

This rule is important because experience has shown that when people express an opinion about the case or about a witness, they may become attached to that opinion and their views may harden, and it's important that that not happen and

that you all keep an open mind until you have heard all of the evidence, so don't talk about the case even with each other, please, until I tell you to do so. Not talking to each other about the case includes not texting, e-mailing, creating a Facebook group, or doing anything of the like.

Next, you're not to read anything in the newspapers or elsewhere about this case if that should occur. Don't listen to or view any reporting about this case if it's broadcast on TV, over the radio, or the internet, nor are you to expose yourself to anything on social media regarding the case. If you come across anything, just turn it off, turn the page, click out of it, shut it off.

Next, please, don't do any research or investigation about the case on your own. Don't visit any place you may hear described during the trial. Don't do any research on the internet or in the library or any other reference source. Don't google anyone or anything related to the case. I know it's hard in this day and age not to go to the internet when you're curious about something, but I can't emphasize enough how important it is to the parties that you not do that or any form of outside research relating to this case while the trial is ongoing.

The reasons for the rules against media reports or outside research are that what you might learn could be wrong and it would be unfair to the parties if you were to have

information from outside sources that the parties did not know about and did not have the opportunity to address.

Next, be sure, please, that I'm informed if any person you recognize comes into the courtroom. This is a public trial so that could happen, but it's important that you do not hear from them what may have happened in the court while the jury was not present. If you should see someone you know come into the courtroom, please send a note to me through Mr. Frankel at your first opportunity.

Next, you are not to allow anyone to speak to you about this case. If you're approached by anyone to speak about it, politely tell them the Judge has directed you not to do so, and I am doing just that. You should not remain in the presence of others who may be discussing the case. If any person approaches you or seeks to contact you about the case, you're required to report the incident promptly to me, and you can do that by giving a note to Mr. Frankel.

The lawyers, the parties, and the witnesses are not supposed to talk to the jury outside of the courtroom, even to offer a friendly greeting, so if you happen to see any of them outside the courtroom, they will and should ignore you. Don't take any offense; that's what they're supposed to do. Experience has shown that even innocent conversations with jurors can sometimes be misinterpreted so that you have a hard-and-fast rule that the lawyers, the parties, the witnesses

can't speak to the jurors, period.

The parties are entitled to have you personally render a verdict in the case on the basis of your independent evaluation of the evidence presented here in the courtroom. Speaking to others about the case or exposing yourself to information outside the courtroom would compromise your fairness to the parties, so that's really the reason for all of these rules.

Finally, if anything should happen involving any juror that is sort of an unusual-nature thing or which is something you think I should be told about, don't discuss it with any juror. Please simply give Mr. Frankel a note to the effect you want to speak to me about it and then I can hear what you have to say. I make these remarks not expecting anything unusual or improper to happen, it's just safer to take that precaution by alerting you.

Finally, a few words about the trial process.

The trial has five parts.

First, each party will have an opportunity to make an opening statement to you, I hope, which we'll do this afternoon. As I told you already, these statements are not evidence. Their purpose is to give you an idea of the evidence that the parties expect you to see and hear, but whether those expectations pan out can only be decided once all the evidence is in, so the opening statements are a preview of what the case is about, but

remember that the evidence only comes in from the witnesses, the exhibits, and the stipulations.

The Government has the burden of proof, so it will go first. The defendants have no burden of proof and don't have to prove anything at this trial so the defendants don't even have to give an opening statement, but if they choose to, the defendants' lawyers will go next.

After the opening statements, you'll hear the testimony of the witnesses. This is the longest part of the trial. The Government's witnesses go first. Each witness will give direct testimony and then he or she may be cross-examined by the other side. Sometimes there will be redirect and, occasionally, recross. Again, the defendants don't have to question witnesses, but they may choose to do so. Exhibits, that is, documents and physical evidence, will be received in evidence.

Following the Government's case, the defendants may, but do not need to, present witnesses and other evidence. If the defendants call witnesses, those witnesses will be examined and cross-examined just as the Government's witnesses were. If the defendants choose to present evidence, it's possible that the Government would then present some rebuttal evidence.

Third, after all the evidence has been received, the parties will each have an opportunity to make closing arguments. The Government and the defendants may review the evidence and

make arguments to you as to what conclusions they think you should or should not draw from the evidence. These arguments also are not themselves evidence, but they may be helpful to you when reviewing the evidence during your deliberations.

After these arguments and summations, as they are called, I'll give you detailed instructions as to the law that applies and controls in this case, and you must follow those instructions. The instructions to the jury are sometimes referred to as the jury charge.

Finally, after the jury charge, you'll go to the jury room to deliberate and discuss the evidence in order to decide the facts and render a verdict.

A few housekeeping matters before we begin.

Each morning, you'll report to the jury deliberation room. Mr. Frankel will show you there in a little while. He'll also give you his cellphone number where you can reach him in case of an emergency. Please be certain not to leave without giving him your home and cellphone numbers, just in case we have a last-minute emergency.

Our trial begins at nine-thirty. It's important that you be here on time because we can't start until all 16 of you are here. The enticement is, we'll have coffee and donuts and bagels and fruit waiting for you early if you get here around quarter to nine or so. No later than 9:15; I need all 16 of you in place. Please adhere to that rule. We need you ready to go

by then.

There are other trials going on this week, so there could be a line outside. We'll give you jury passes so you can bypass the line and come in.

We'll take a mid-morning break around eleven and a lunch break from one to two. We'll take a mid-afternoon break around 3:15, 3:30, and we'll end on each day approximately five p.m. On Tuesdays, we'll adjourn early, which we are today, and we will not sit on Friday, September 20th, September 27th, those are both Fridays, and for the Jewish holidays, Thursday and Friday October 3rd and 4th, and we'll remind you as we go.

If you need a personal break before or after our scheduled breaks, raise your hand, but if you could wait, please, we'd greatly appreciate it.

Finally, if you wish to take notes during the course of the trial, you may do so. Mr. Frankel will distribute to you notebooks.

Now, if you do take notes, you have to leave your notebooks in the jury room when you leave at the end of each day. If you do take notes, make sure that your taking of notes does not interfere with your listening to or considering all the evidence.

Also, if you do take notes, you can't discuss your notes with anyone before or during deliberations. If you take notes, they're to be used solely to assist you, and your notes

are not to be a substitute for your recollection of the evidence.

Your notes are for your own personal use; they're not to be given or read to any other juror. The fact that one juror takes notes and another doesn't does not entitle the note-taker juror's view to any greater weight than those of any other juror, and your notes are not to be shown to any other juror during the course of your deliberations.

You may use your notes to refresh your recollection, but the official record of what occurs during the trial will be the transcript prepared by our court reporter Darby. If during your deliberations you have any doubt as to any of the testimony, you'll be permitted to request that the official transcript, which is being made of these proceedings be read back to you. All right?

Now that you have your notebooks, we'll begin with opening statements.

Ms. Arroyo or Mr. Maimin?

MS. ARROYO: Thank you, your Honor.

THE COURT: You may proceed.

MS. ARROYO: One morning, in April of 2020, a husband and wife got into their family SUV and took a very odd, very specific drive from Beacon, New York, across the river into the entrance of a park in Newburgh. Just a few hours later, they planned and executed that exact same route again. It was almost

as if they were rehearsing something. It was almost as if they wanted to get something exactly right. And that's because they were rehearsing something, they did want to get something exactly right.

Two days later, the man drove that exact same very odd and very specific route for a third time, but this time, he was not in the family's SUV. He was driving a car that he had just stolen from his wife's ex-husband and was on his way to dump his car at the entrance of the park in Newburgh, just as he and his wife had planned. And where was the ex-husband? Dead. Murdered. By his ex-wife and her new husband. And that's why we're here today. Because that man, Nicholas Orsini, and that woman, Jamie Orsini, are murderers, and when they orchestrated that murder, by taking that car, they committed the federal crime of carjacking.

Members of the jury, this opening statement is the Government's opportunity to give you a preview of the evidence you will expect to see and hear at this trial. I would like to do that in two parts. First, I'm going to talk about what the evidence is going to show, and second, I'll discuss how that evidence will be presented to you.

So what will the evidence show.

During this trial, you will learn that in late April and early May of 2020, the defendants orchestrated a plan to commit the murders of their victim and a carjacking to eliminate

any trace of their involvement.

Jamie Orsini was once married to the victim, Steven Kraft. Jamie and Steven had two daughters together. After the two divorced, Jamie married Nicholas, and Steven's daughters lived with Jamie and Nicholas in Beacon, New York. Steven regularly visited his daughters, taking them out for meals and other activities.

One day, in 2020, Steven picked up his two daughters from the defendants' apartment in Beacon, took them out for a meal, and brought them back. Nicholas and Jamie knew this was the plan because Steven had scheduled visitation with his daughters every Tuesday at the same time. This particular drop-off was the last time that anyone would see Steven Kraft alive, and after you see and hear all of the evidence, you will know that that's because this was the night that Nicholas and Jamie carried out their plan to kill him.

So first, let's talk about the defendants' painstaking plan, a plan the defendants put in motion days before they killed Steven and took his car.

Two days before the carjacking and murder, Nicholas and Jamie went to a Home Depot and bought some of what they would use to carry out their plan: 1,000 square feet of plastic sheeting, duct tape, a disposable full-body suit, and shoe covers. The evidence will also show that taking Steven's car was a key piece of this plan. The same morning that the

defendants went to Home Depot, they also drove their SUV along that very specific, very odd route from Beacon to the park in Newburgh, a route that certainly wasn't the most convenient, a route that took them two extra exits west down the highway, then had them cut back east in the direction that they had just been going, and it made them snake their way through residential streets in Newburgh. It was a dry-run route to the park where they would eventually abandon Steven's car. Having charted that route, they went back home. Later that day, the defendants planned and executed that drive again, repeating the same specific route.

The next day, the defendants bought another essential tool for their plan: a phone that wasn't registered in their name, a phone that nobody should have been able to trace back to them, what's commonly known as a burner phone, and a phone that they used during the carjacking and murder and that Nicholas disposed of just 33 hours after he bought it.

You will also hear evidence about the day that Steven was murdered.

You'll learn that up until he was killed, the last day of Steven 's life was very normal. That morning, he got up and went to his job. He left work, then picked up his daughters from the defendants' home for their weekly visitation. He bought them dinner at a fast-food restaurant, then took them to his apartment to eat and spend time with them. When Steven's

visit with his daughters was over, he drove them back to the defendants' home in Beacon, just as he did after every visit.

By contrast, the defendants' actions while the girl were with Steven were anything but normal. While Steven watched his daughters, the defendants put their plan into action.

First, the defendants followed Steven and his daughters to the restaurant, by all accounts without Steven knowing that they were following behind, and afterwards, they drove to a nearby store and activated the burner phone, which they would not use again until they were cleaning up their crime, and then they went home, to wait for Steven. And what did the defendants do that evening after Steven returned to their apartment? Well, the evidence will show that the defendants went to great lengths to try to hide the answer to that very question.

They made sure there were no witnesses. They made sure to keep things clean. Remember the 1,000 square feet of plastic sheeting, the shoe covers, and the full-body suit? And worried that their phones could be used to track them, the defendants made sure that their own phones remained at home all night to make it look like they were also at home. Jamie even sent texts from their regular phones to make it look like it was just a normal night with nothing criminal happening at all.

They didn't think of everything, though. They made mistakes. And they got caught. You see, the defendants not

only had to get rid of Steven's body, they also had to get rid of Steven's car and the phone that they had on him. But what they didn't know was that Steven had two phones that night, one that went with him when he left the car and another that remained hidden in the console.

About two hours after Steven returned to the defendants' apartment, Nicholas, wearing a black and red Levi Stadium hat, grabbed one of Steven's cell phones, got in Steven's car, and drove to Newburgh. Using location data from Steven's two phones and the burner phone, you will see that Nicholas drove along that exact same very odd and very specific dry-run route he had driven twice just two days before. Then, he dumped Steven's car in front of the park as planned.

You'll see that Nicholas took Steven's phone, at least the one that he knew about, out of the car and disabled it as he walked to a gas station about a mile away. The hidden phone remained in the car, intact. Then, once at the gas station, Nicholas used his burner phone to call a local taxi company before throwing the burner phone into one of the gas station's trash cans. The taxi picked Nicholas up and dropped him off near their home. But the defendant's weren't done after they disposed of Steven's car. They spent the next several days covering up their crime, buying a new burner phone, disposing of evidence, and trying to mislead the police.

The first thing they did the morning after the

carjacking was to buy another burner phone. Then, they drove to Amsterdam, New York, which is about a two-hour drive from Beacon, New York, where Nicholas' family owns about 100 acres of land. A couple of hours later, they drove right back to Beacon. During that entire time, they only had that burner phone. They left their own phones at home so that nobody could track them and to make it appear like they stayed at home, too. The defendants made the same four-hour drive again, just two days later. Again, they left their phones at home, brought only the new burner phone, and were back in Beacon the same day. And then they went a third time the next week, same round-trip, two hours both ways, without their personal phones. They did bring the burner, though.

The defendants also weren't idle between that second and third trip. You'll learn that between these trips, the police began to speak to Jamie and Jamie began to talk to the police. You will hear that Jamie claimed total ignorance regarding Steven's whereabouts, but repeatedly came up with theories of why people in Newburgh might have had it in for him, theories that would make finding Steven's car in Newburgh, specifically as she and Nicholas planned, a reason for the police to look elsewhere for Steven's killer.

You'll also learn that after the defendants came home from Amsterdam trip no. 2, the defendants tried to cover their tracks again by changing the phone number on that second burner

phone. Also, the day after trip no. 2, Nicholas started to look into what people may have already found out. He searched for Orange County news and Montgomery County news in Google. You see, Newburgh, where Nicholas took Steven's car, is in Orange County, and Amsterdam, where Jamie and Nicholas were making their day trips with the burner phone, is in Montgomery County.

That same day, Nicholas googled "is galvanized steel fireproof." Shortly after that, the defendants went to Home Depot again, and guess what they bought? Not one, but two, 30-gallon galvanized steel bins, an angle grinder, metal disks, hole saws, thick medal rods, grill grates, and a charcoal lighter. The next morning, Nicholas went back and purchased 16 bundles of firewood. The defendants used these items to create a makeshift grill in their backyard. The neighbors say they smelled a terrible, foul smell that lasted for days, a stench that none of them recall smelling every before or since.

For all of this, the defendants have been charged with two federal crimes: the first is for committing a carjacking resulting in death, for killing Steven Kraft and taking his car to get rid of it as a part of their horrific crime; the second is for conspiring, in other words, just agreeing, to commit that carjacking.

Well, now that you know what some of the evidence will show you, you may be asking, what will that evidence be. After all, you know that there's evidence that you won't see. You

will not see Steven Kraft's body, you will not see DNA or fingerprint evidence from the carjacking or his murder, and you will not hear from someone who saw either crime. After all, as the evidence will show, that was the whole point of defendants' elaborate plan.

But what you will see is the evidence that the defendants overlooked. You will see surveillance videos from places like government buildings, gas stations, stores, and restaurants, along with receipts from those stores and restaurants. This evidence will show you where the defendants actually were, what they were actually doing, and what they were buying there.

This evidence will show you, for example, that the defendants' phones traveled together to each trip to Home Depot, that Jamie went in to buy the body suit and the thousand square feet of plastic sheeting, and that Nicholas purchased the steel bins and the firewood. It will show that they traveled together to buy the burner phones and that they each made calls using at least one of them. You will see and hear evidence about the phones, Nicholas' phone, Jamie's phone, their daughters' phone, the burner phones, and Steven's phone. You'll see text messages, emails, and internet searches made and received using those phones.

You'll learn not only what was found on some of those phones, but also about various technologies that allow you to

know not only which phones made a call or a text, but also approximately where those phones were and often, as importantly, where those phones were not at certain times.

You will also hear about searches conducted at the defendants' homes, in the Beacon apartment, and also in their home in Amsterdam, where they moved several months later. You will hear about what was found in those apartments, like the black and red Levi Stadium hat that Nicholas wore when he stole Steven's car, and what was not found, like the full-body suit or six hundred of the 1,000 feet of plastic sheeting that the defendants bought two days before executing their murder plan.

You will hear from different people, friends, colleagues, neighbors, and officers, who dealt with the defendants. They will tell you what they saw, what they did, and what they smelled.

And finally, you will hear from the defendants themselves in text messages, emails, recorded calls, and through the people they talked to. You'll hear recordings of Jamie trying to shift police's focus away from her and Nicholas, and you'll hear that when Steven's boss called Jamie, worried and looking for Steven, Jamie put her off. You will hear from Nicholas' co-worker and his boss who will show you text messages where Nicholas lied about why he missed work the night of the carjacking and murder, but you will know that he is lying because you will see other evidence such as phone location and

surveillance footage that make those lies clear.

Now, no one single piece of evidence will tell you the whole story, but you will be able to put them together and understand what happened. You will see how location data associated with different phones and accounts align with the purchase of key items, like the burner phones or the steel bins; you will see video footage from stores in Newburgh that show Steven wearing the items that were later found in the defendants' home; and you will hear testimony that puts into context the defendants' purchase of 16 bundles of firewood. Taken together, this evidence will prove to you that the defendants committed the federal crime of carjacking when they murdered Steven and stole his car as a part of that plan.

The defendants knew when Steven would be driving back to their home, and they picked that time to kill him. They planned the route that they would drive to dump his car after the murder, knowing that they would then be able to weave a tale for police of why Steven must have gone to Newburgh and been killed there and that surely, he wasn't killed in their home. And you will be able to determine that when the time came, they killed him and took his car exactly as they planned.

Members of the jury, by the end of this trial, you will see the full picture of the defendants' crimes. You will know that the defendants, Jamie Orsini and Nicholas Orsini, are responsible for the murderous carjacking of Steven Kraft.

Once the evidence is in, we will have a chance to talk to you again about how it all fits together, and this is important, because as you probably figured out, this is not like a TV show. The evidence does not come in in a way that tells the story on its own, it comes in in bits and pieces, but while you're listening to and looking at the evidence and while you're putting it all together, I'm going to ask for you to do three things: first, pay close attention to the evidence; second, follow Judge Halpern's instructions on the law; and third, use your common sense, the same common sense that you use every day. If you do those three things, you will come to the only verdict that is consistent with the evidence, the law, and your common sense; the defendants are guilty.

Thank you.

THE COURT: All right, thank you, Ms. Arroyo.

Counsel. Mr. Yannella.

MR. YANNELLA: Yes. Good afternoon. Once again, my name is Donald Yannella, and together with Avraham Moskowitz, we represent Jamie Orsini.

The evidence is going to show that our client Jamie Orsini had been married to Steven Kraft. They had two children together, but they divorced more than a decade ago. Jamie Orsini then married Nicholas Orsini and they had two children together.

Now, Steven Kraft, the father of the first two

children, had visitation rights, and the evidence is going to show that he visited with his children on April 28th, 2020, and at the end of that visitation, he dropped the children off at the Orsini residence in Beacon, New York, and according to the Government's witnesses and the evidence, there's been no further communication from him.

Now, this is a very unusual case for two reasons. You've already heard that it's a carjacking-resulting-in-death case or, as the Government's calling it, a murder. Regarding the carjacking, you're going to have evidence that Mr. Craft's Toyota Camry traveled from Beacon, New York, over to Newburgh, New York, but there will be no evidence of a carjacking. I'll repeat that. No evidence of a carjacking. And on the murder end of it, the Government says that he's been murdered, but there's not even proof that he is dead.

Now, let's just turn for a moment to the carjacking.

What is the type of evidence you might expect in connection with a carjacking. Well, nothing that we have here.

There is no demand for the vehicle. There's no demand for the keys. As far as spoken words, there's no threats. There's no hostility, there's no anger, there's no confrontation with a driver, there are no surveillance recordings showing that a car had been car-jacked or a person had been car-jacked of their car.

There are no eyewitnesses to any carjacking. The

Government has only a general time frame from April 28th, 2020, and they can't even tell you a specific time. There's no evidence of how any vehicle was taken, whether by force or otherwise, and there's no evidence that a vehicle even was taken, so that's the type of evidence we're going to have in this case. And as far as the murder, you have no autopsy report, no cause of death, no gunshots, no other evidence that a killing occurred.

The prosecutors are saying that this is meticulously planned? Well, pay attention closely to the evidence, because I think you're going to hear that this happened in a residential neighborhood in Beacon, New York, and that the kids were dropped off at a house that had two apartments in it, houses all around it, and you're not going to hear any evidence that anybody heard any type of life-and-death struggle or any person screaming. There's no murder weapon. You've already heard from the Government there's no forensic evidence, no DNA, no blood, no fingerprints, connecting the defendants to the crime. And last, but not least, and, really in this case last, but not least, there is no dead body. There's not even proof that Kraft is dead, so that's the type of evidence you're going to hear over the next week or two.

Now, during this case, it's one big, single trial, but you have two defendants and you also have two counts in the Indictment, so although it's one trial, it's really a series of

decisions you have to make within that context. You have to judge each defendant individually and you have to judge each count individually.

The defense is not required to present a case. I'm not even required to make an opening statement. We don't have to make a closing argument. We don't have to cross-examine witnesses. It's the Government's burden to prove carjacking resulting in death, and not just to prove it, but prove it beyond a reasonable doubt.

So at the close of all the evidence, there's going to be only one reasonable verdict for Jamie Orsini, and that is not guilty on both counts in the Indictment.

THE COURT: All right, Mr. Yannella, thank you.

Mr. Patel.

MR. PATEL: Thank you, your Honor.

Good afternoon and thank you for your attention, and I'm going to speak from here because, as you can hear, my voice is a little shot.

There are a lot of people in the well. Just to re-introduce everyone, my name's Andrew Patel. I represent Nicholas Orsini, the gentleman in the gray suit with the beard. And my co-counsel is Bruce Koffsky, and Lindsey Sullivan has been working with us, she's a paralegal.

Opening statement is about what we expect the evidence to show and also what the evidence will not show. During this

trial, you will not see a photograph of a dead body, no autopsy report, no medical examiner, no cause of death, no weapon or object that caused death, no DNA experts, no blood-splatter experts, no fingerprints. You will see photographs of houses, cars, street signs, but no photographs of a crime scene. No one will testify that anyone died, much less where they died or how they died. A guess, a theory, a hunch is not proof beyond a reasonable doubt. You will hear no evidence that Nick Orsini -- and we tend to refer to him as 'Nick' rather than Nicholas. You will hear no evidence that Nick Orsini killed anyone, you will hear no evidence that Nick Orsini car-jacked anyone, you will hear no evidence that Nick Orsini agreed to car-jack anyone.

At the end of the trial, when you listen to Judge Halpern's instructions on the law, when you consider whatever evidence has been presented, you'll also consider what evidence has not been presented, and when you apply your common sense, you will come to the only reasonable conclusion, that a guess, a theory, a hunch is not proof beyond a reasonable doubt and that Nick Orsini is not guilty.

Thank you.

THE COURT: All right, Mr. Patel, thank you for that.

All right, ladies and gentlemen of the jury, as I indicated before the trial started, you, as jurors, will decide this case based solely on the evidence presented here in my courtroom, which means that after you leave here for the night,

you must not conduct any independent research about the case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case. You must also not communicate with anyone in any way about the case. Also, you must ignore any information about the case you might see while browsing on the internet or your social media feeds. In the morning, I'll confirm with each of you that you have adhered to this strict rule. Thank you for adhering to the rules in advance.

Get some rest, get a good meal, we'll have a full day tomorrow, all right?

Mr. Frankel, take the jury, please.

THE DEPUTY CLERK: All rise.

(In open court; Jury not present)

THE COURT: All right, counsel, be seated for a moment.

I'm here early each day, so if you need me in the morning for morning business, we can deal with that right around nine o'clock. We'll start at nine-thirty and we'll have a full day tomorrow. Please have your witnesses ready to go. There's...numerous witnesses in this case so, please, have them ready to go. I don't want to waste time. Those of you that have worked with me before, I'm a stickler about pushing time and wasting time. When a jury's in the box, I feel we owe it to them as citizens to keep the trial moving along so that they

feel their time is not being wasted.

All right, is there anything else I can do for anybody today?

MR. MAIMIN: Nothing from us.

MR. YANNELLA: Can we get a list of witnesses who are expected to go on tomorrow?

THE COURT: This is a typical request. I don't see any problem with asking the Government to be courteous and each day let the other side know who's coming to court that day.

Will you do that?

MR. MAIMIN: Of course. Not realizing that we would start so late today, we already gave them a list of witnesses for -- that we thought was today that will start tomorrow, and we'll add to that for them.

THE COURT: All right, yes. You got what you asked for, Mr. Yannella.

Anything else? All right, I'll see you all in the morning.

MR. MAIMIN: Thank you, your Honor.

(Proceedings adjourn until Wednesday, September 18, 2024, at 9:30 a.m.)